# In re Melanie Beaucejour JEAN, Respondent[1]

## File A25 452 154

### *Decided May 2, 2002*

### U.S. Department of Justice
### Office of the Attorney General

(1) The 30-day period set forth in 8 C.F.R. § 3.38(b) (2002) for filing an appeal to the Board of Immigration Appeals is mandatory and jurisdictional, and it begins to run upon the issuance of a final disposition in the case.

(2) The Board of Immigration Appeals' authority under 8 C.F.R. § 3.1(c) (2002) to certify cases to itself in its discretion is limited to exceptional circumstances, and is not meant to be used as a general cure for filing defects or to otherwise circumvent the regulations, where enforcing them might result in hardship.

(3) In evaluating the propriety of granting an otherwise inadmissible alien a discretionary waiver to permit adjustment of status from refugee to lawful permanent resident pursuant to section 209(c) of the Immigration and Nationality Act, 8 U.S.C. § 1159(c) (2000), any humanitarian, family unity preservation, or public interest considerations must be balanced against the seriousness of the criminal offense that rendered the alien inadmissible.

(4) Aliens who have committed violent or dangerous crimes will not be granted a discretionary waiver to permit adjustment of status from refugee to lawful permanent resident pursuant to section 209(c) of the Act except in extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of status adjustment would result in exceptional and extremely unusual hardship. Depending on the gravity of the alien's underlying criminal offense, such a showing of exceptional and extremely unusual hardship might still be insufficient.

(5) Aliens who have committed violent or dangerous crimes will not be granted asylum, even if they are technically eligible for such relief, except in extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of status adjustment would result in exceptional and extremely unusual hardship. Depending on the gravity of the alien's underlying criminal offense, such a showing of exceptional and extremely unusual hardship might still be insufficient.

## IN REMOVAL PROCEEDINGS

By previous Order, I directed the Board of Immigration Appeals ("BIA" or "Board") to refer this case to me for review pursuant to 8 C.F.R.

---

[1]  In publishing this opinion in its current format, the Attorney General is invoking his discretion pursuant to 8 C.F.R. § 208.6(a) (2002).

§ 3.1(h)(1)(i) (2002).[2] Overruling the decision of an immigration judge, a BIA panel declared that the respondent's conviction for second-degree manslaughter did not render her ineligible for asylum or withholding of removal, and that the likely hardship her family would endure if she were returned to Haiti merited adjusting her status from refugee to lawful permanent resident. For the reasons set forth below, I now reverse the BIA's decision and hold that the interests of the respondent's family and the general public would be ill-served by granting her lawful permanent residency in the United States. I further conclude that the respondent is not entitled to any alternative relief from removal.[3]

## I.

Respondent Melanie Beaucejour Jean is a forty-five-year-old foreign national from Plaisance, Haiti. Accompanied by her husband and five children, she was conditionally admitted into the United States as a refugee in November 1994 pursuant to section 207 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1157 (1994).[4]

In August 1995, the respondent pled guilty in the County Court for Monroe County, New York, to one count of second-degree manslaughter in connection with the March 30, 1995 death of nineteen-month-old R-J-. According to the respondent's signed confession, R-J- had been left in her care that day by the boy's mother – who was also the sister-in-law of the respondent's husband – in an apartment the two families shared in Rochester, New York. Early in the afternoon, the young child fell off a couch in the apartment and began to cry. The respondent reacted by striking the toddler's buttocks two or three times with her open hand in an attempt to quiet him. When this effort proved unsuccessful, she picked the boy up by the armpits and shook him. She then

---

[2] My review of BIA decisions is *de novo*. *See Deportation Proceedings of Joseph Patrick Doherty*, 12 Op. O.L.C. 1, 4 (1988) ("[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make de novo factual determinations.").

[3] This published decision is binding on the BIA and is intended to overrule any BIA decisions with which it is inconsistent. *See Iran Air v. Kugelman*, 996 F.2d 1253, 1260 (D.C. Cir. 1993) (administrative judges "are entirely subject to the agency on matters of law"); *see also* 8 C.F.R. § 3.1(g).

[4] The opinions of both the immigration judge and the BIA inaccurately characterize the nature of the respondent's entry into the United States. She was neither *paroled* nor *permanently admitted* into the country. Rather, she was *conditionally admitted* as a refugee under INA § 207, which had the effect of deferring her admissibility inspection and examination by federal immigration officials. *See Matter of Garcia-Alzugaray*, 19 I&N Dec. 407, 408-10 (BIA 1986).

hit him two or three times on the top of his head with her fist. Finally, she picked him up again and shook him until he lost consciousness. Upon observing that the child was no longer breathing and that his eyes, although open, had stopped blinking, the respondent placed him on a bed just off the living room. She neither called 911 nor sought any other emergency assistance. When her husband returned to the apartment with the child's mother approximately one hour later, the respondent told them that R-J- had passed out in their absence.

The medical examiner's report described bruises to R-J-'s head, chest, and back; internal hemorrhages of the lungs, pancreas, and diaphragm; and acute subdural and spinal epidural hemorrhages. The report determined that R-J- died from bleeding and swelling inside his skull caused by blunt trauma, and that the death was a homicide.

During her plea colloquy with the Monroe County Court judge, the respondent maintained that she did not attempt to contact emergency personnel after shaking the child into an unconscious state because, in the interim, she was preoccupied with a long-distance telephone conversation and thought the boy was in bed sleeping. She added that phoning emergency officials would have been difficult inasmuch as she does not speak English well and thus may not have been understood.[5] A month after the plea hearing, the court sentenced her to two-to-six years' incarceration.

Following the completion of her state sentence, the respondent requested an adjustment of her status from "refugee" to "lawful permanent resident" pursuant to INA § 209(a), 8 U.S.C. § 1159(a) (1994 & Supp. V 1999). The Immigration and Naturalization Service ("INS") denied this application in July 1999 and commenced formal removal proceedings against her as an inadmissible alien convicted of a crime of moral turpitude.[6] *See* INA §§ 212(a)(2)(A)(i)(I), 240(a), 8 U.S.C. §§ 1182(a)(2)(A)(i)(I), 1229a(a) (1994 & Supp. V 1999). Although the respondent did not contest the fact that she

---

[5] At the plea colloquy, the respondent also sought to retreat from some of the more damning admissions in her earlier written confession. Without making any factual findings regarding these *post hoc* attacks on the confession, the Monroe County judge, in a not altogether clear discussion, seemingly concluded that New York law permitted him to accept the respondent's guilty plea to second-degree manslaughter as charged in the indictment based on her failure to seek medical help when R-J- stopped breathing.

[6] A month earlier, the INS had prematurely initiated removal proceedings against the respondent without affording her an opportunity to seek an adjustment of status under INA § 209. The agency corrected this deficiency by terminating the earlier removal proceeding, adjudicating her application, and commencing a new removal proceeding. *See* Hr'g Tr. (July 21, 1999) at 13-14.

was inadmissible in light of her manslaughter conviction – indisputably, a crime of moral turpitude – she sought a waiver of inadmissibility under INA § 209(c), citing her fear of persecution upon return to Haiti as well as her desire to keep her family together in the United States. In addition, she requested asylum pursuant to INA § 208, 8 U.S.C. § 1158 (Supp. V 1999), and withholding or deferral of removal pursuant to both INA § 241(b)(3), 8 U.S.C. § 1231(b)(3) (Supp. V 1999), and Article 3 of the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("Convention Against Torture"), *see* 8 C.F.R. §§ 208.16-208.18 (2002) (regulations implementing Convention).

An immigration judge ruled that the respondent's second-degree manslaughter conviction constituted an "aggravated felony" within the meaning of the INA and, on this basis, declared her ineligible for all relief from removal.[7] IJ Oral Decision (Aug. 18, 1999) at 1-2. The respondent appealed to the BIA, which reversed the immigration judge's decision. Relying on its opinion in *Matter of Sweetser*, Interim Decision 3390 (BIA 1999), the Board concluded that the respondent's criminal conviction did not amount to a "crime of violence" – the necessary predicate for classifying the offense as an "aggravated felony" under the facts of this case – "because there was no substantial risk that physical force would be used in the commission of the crime." BIA Decision (Dec. 16, 1999) at 2. The Board then remanded the case back to the immigration judge for the purpose of giving the respondent "an opportunity to apply for any relief from removal for which she may be eligible." *Id.*

---

[7] Although the immigration judge's reasoning is not entirely clear from his brief oral decision, he appears to have improperly analyzed the respondent's adjustment of status application under INA § 245, 8 U.S.C. § 1255 (1994 & Supp. V 1999), which bars relief to aliens convicted of crimes involving moral turpitude, *see* INA § 245(a)(2) (restricting adjustments of status to aliens who meet INA § 212 standards of admissibility), rather than INA § 209, which contains no such express proscription. As noted in Part III.A., *infra*, individuals like the respondent who have been admitted (or conditionally admitted) into the United States as refugees can seek an adjustment of status only under section 209. With respect to the respondent's INA-based claims for asylum and withholding of removal, the immigration judge obviously grounded his ineligibility determination on statutory provisions precluding the grant of such relief to aliens convicted of "aggravated felonies," *see id.* § 208(b)(2) (asylum), or "particularly serious crimes," *see id.* § 241(b)(3)(B) (withholding of removal). But the rationale for the judge's denial of all relief under the Convention Against Torture is nowhere reflected in the decision. An aggravated felony conviction could not have formed the necessary predicate because an alien's criminal history is irrelevant in examining his or her entitlement to *deferral* of removal under the Convention. *See Matter of Y-L-, A-G- & R-S-R-*, 23 I&N Dec. 270, 279 (A.G. 2002).

On remand, the immigration judge conducted several evidentiary hearings and issued two decisions which, in combination, denied all relief requested by the respondent. Addressing the adjustment of status issue, the judge found that a determination regarding the propriety of such a discretionary grant of relief required a balancing of "the adverse factors evidencing [the respondent's] undesirability as a permanent resident [against] the social and humane considerations presented on her behalf." IJ Decision (May 4, 2000) at 3. After weighing these considerations, the judge concluded that there was no sound basis for a grant of lawful permanent residency to the respondent. *Id.* at 3-5.

The immigration judge next held that the respondent had no right to asylum. He noted that not only did the respondent fail to demonstrate an objectively reasonable fear of persecution in Haiti, but the nature of her criminal conviction rendered her ineligible for such relief. *Id.* at 5-10. On the latter point, the judge reasoned that, unlike the Colorado criminally negligent child abuse statute that the BIA examined in *Sweetser*, second-degree manslaughter in New York required an affirmative act on the part of the offender. *Id.* at 8-10. As a result, the offense satisfied the criteria for a "crime of violence," and thus qualified as an "aggravated felony" under the INA. *Id.*

The immigration judge's finding regarding the risk of persecution to the respondent also supported the rejection of her application for withholding of removal under INA § 241. Having determined that the respondent failed to demonstrate the "well-founded fear of persecution" necessary to qualify for asylum, the judge held that the respondent necessarily fell short in her effort to meet the far more demanding "clear probability of persecution" standard required to obtain relief under section 241. *Id.* at 10 (citing *INS v. Stevic*, 467 U.S. 407, 430 (1984)).

In a separate opinion issued weeks later, the judge denied the respondent's claims for withholding or deferral of removal under the Convention Against Torture as well. He found that the record failed to support the respondent's allegation that those individuals or entities in Haiti who had purportedly attacked her husband and burned her family's home years earlier continued to persecute opponents of the former military regime. *See* IJ Decision (May 25, 2000) at 3. He further noted that there was no credible evidence that such individuals or entities, to the extent they are still engaged in political violence, would find the respondent if she took up residence somewhere other than the village where she had previously lived. *Id.*

Following the issuance of these adverse decisions, the respondent pursued a second administrative appeal to the BIA, which once again reversed the immigration judge. In a cursory opinion, the Board chastised the immigration judge for not adhering to its earlier ruling that the respondent's second-degree manslaughter conviction did not represent a "crime of violence." BIA Decision (Mar. 1, 2001) at 1-2. The Board then held that, under its own view of the evidence, the respondent had established her eligibility for a waiver of inadmissibility and an adjustment of status from refugee to lawful permanent resident. *Id.* at 2. Finally, the Board concluded in a single sentence that "the equities," when weighed against the respondent's criminal conviction, warranted the grant of such discretionary relief.[8] *Id.*

## II.

Before turning to the merits, I must first examine the INS's contention that the BIA lacked jurisdiction to hear the respondent's post-remand appeal because it was untimely. INS regulations dictate that appeals from the rulings of immigration judges must "be filed directly with the [BIA] within 30 calendar days after the stating of an Immigration Judge's oral decision or the mailing of an Immigration Judge's written decision." 8 C.F.R. § 3.38(b) (2002). The effective date of any such appeal is the day the notice of appeal is received by the Board. *Id.* § 3.38(c). This deadline is mandatory and jurisdictional. *Da Cruz v. INS*, 4 F.3d 721, 722 (9th Cir. 1993).

Counsel for the respondent filed two post-remand notices of appeal with the BIA in this case, responding separately to the immigration judge's two post-remand decisions. The immigration judge's initial decision on remand, which denied the respondent's applications for adjustment of status, asylum, and withholding of removal under the INA, was dated May 4, 2000. It was mailed to the respondent that same day, *see Karimian-Kaklaki v. INS*, 997 F.2d 108, 111 (5th Cir. 1993) (date of INS transmittal letter accepted as dispositive evidence of the mailing date, absent specific evidence to the contrary), accompanied by a notification form warning that the decision would become final unless an appeal was filed with the BIA "within 30 calendar days of the date of the mailing of this written decision." The immigration judge later issued a second post-remand decision, denying the respondent's remaining claims under the Convention Against Torture, on May 25, 2000. This latter decision was also mailed on the date of its issuance, and contained

---

[8] Having granted the respondent's application for adjustment of status to lawful permanent resident, the BIA did not address her claims for asylum and withholding or deferral of removal.

an identical warning that it would become final unless appealed within thirty days.

The respondent's first notice of appeal, which was filed on June 6, 2000, indicated explicitly that she was appealing from the immigration judge's May 4 ruling. Her second notice of appeal, which was filed on June 28, 2000, stated specifically that she was challenging the immigration judge's May 25 ruling. The INS maintains that both appeals were untimely inasmuch as the first was filed thirty-three days after the first decision, while the second was filed thirty-four days after the second decision. Although I agree with the INS that the respondent failed to preserve her challenge to the immigration judge's adverse decision on the Convention Against Torture claim, I reach this conclusion for different reasons than those advanced by the INS. As for the respondent's appeal of the denial of her other requested relief, I find that her notice was timely.

At the time of the immigration judge's initial post-remand ruling, there was no final disposition in the case. Any appeal at that moment, therefore, would have been interlocutory in nature. Yet interlocutory appeals are discouraged in immigration proceedings, and the BIA properly declines to review non-final decisions of immigration judges except in highly unusual circumstances. *See Matter of Morales*, 21 I&N Dec. 130, 131-32 (BIA 1996) (BIA ordinarily does not consider interlocutory appeals, but makes occasional exceptions "to address important jurisdictional questions regarding the administration of the immigration laws or to correct recurring problems in the handling of cases before" immigration judges). In light of this practice, I believe it would be unreasonable to construe 8 C.F.R. § 3.38(b) to require litigants to file notices of appeal with the BIA from non-final decisions in order to preserve their objections to such rulings. Accordingly, the notice of appeal filed by the respondent on June 6 – twelve days after the issuance of the May 25 final decision in the case – was timely.

The June 6 notice of appeal did not, however, preserve the respondent's objections to the substance of the immigration judge's May 25 decision, *i.e.*, the rejection of her application for relief under the Convention Against Torture. To perfect an appeal to the BIA, a litigant must file a timely notice on a Form EOIR-26. *See* 8 C.F.R. § 3.38(b). The instructions therein state unequivocally that the appellant must "specify the reasons for appeal" on that form, even if a separate brief or statement will be filed. *See* Form EOIR-26, Notice of Appeal to the BIA of Decision of Immigration Judge (General Instructions VII-VIII). The failure to adhere to this directive may result in the dismissal of the appeal. *See Soriano v. INS*, 45 F.3d 287, 287 (8th Cir.

1995) (per curiam); *Nazakat v. INS*, 981 F.2d 1146, 1148 (10th Cir. 1992); *Matter of Lodge*, 19 I&N Dec. 500, 501 (BIA 1987); 8 C.F.R. § 3.1(d)(2)(i)(D).

The respondent's June 6 notice of appeal refers exclusively to the immigration judge's May 4 decision denying her application for relief under the INA, and contains no reference whatsoever to the May 25 decision denying her Convention Against Torture claim. Although this latter claim is identified in the respondent's subsequent June 28 notice of appeal, that notice was rendered nugatory because it was filed more than thirty days after the immigration judge's final disposition in the case.[9] While there may be rare cases where special circumstances would support a decision to consider issues not properly presented to the BIA in a timely-filed Form EOIR-26, this is not such a case. The Board here, as it often does, ordered simultaneous briefing on the merits, an approach that allows a more expeditious resolution of cases on the docket, and one that would not be feasible if the Board failed to enforce the requirement that appellants clearly specify the reasons for their appeals. Because the record in this case provides no indication of the kind of special circumstances that might justify an exception to this procedural requirement, the respondent's appeal of the adverse ruling on her Convention Against Torture claim shall be dismissed.[10]

---

[9] There is a suggestion in the supplemental briefing that the BIA could have asserted jurisdiction over the Convention Against Torture claim via certification pursuant to 8 C.F.R. § 3.1(c). *See* 8 C.F.R. § 3.39 (2002) ("Except when certified to the Board, the decision of the Immigration Judge becomes final . . . upon expiration of the time to appeal . . . ."). The Board, however, never certified any issue in this case, and such certification cannot be done implicitly. Moreover, while section 3.1(c) allows the Board to certify issues "in its discretion," that discretion is not unbounded. To the contrary, much like discretionary decisions to reopen proceedings *sua sponte* under section 3.2(c), it is limited to "exceptional" circumstances and "is not meant to be used as a general cure for filing defects or to otherwise circumvent the regulations, where enforcing them might result in hardship." *Matter of J-J-*, 21 I&N Dec. 976, 984 (BIA 1997).

[10] As an alternative holding, I find that the respondent's Convention Against Torture claim also fails on the merits. For largely the same reasons articulated in the discussion in Part III.C. of the respondent's claim for withholding of removal, I find she has failed to establish that she is more likely than not to endure torture upon return to Haiti. Nor has she demonstrated, as the Convention requires, that the harms she fears would be inflicted by, or with the acquiescence of, government officials acting under color of law. *See Matter of Y-L-, A-G- & R-S-R-*, 23 I&N Dec. at 279. Finally, it is not at all clear that much of the harm to which the respondent alleges she would be exposed is even covered by Article 3 of the Convention. *See Matter of J-E-*, 23 I&N Dec. 291, 297-303 (BIA 2002).

## III.

The BIA addressed only one of the proposed forms of relief in this case. Its determination that the respondent was entitled to a waiver of inadmissibility and a discretionary adjustment of status from refugee to lawful permanent resident effectively mooted her requests for asylum and withholding of removal.  Because I find the Board's resolution of the adjustment of status issue to be in error, I must examine the respondent's eligibility for these alternative remedies.

### A.  Adjustment of Refugee Status

Aliens, like the respondent, who have been admitted (or conditionally admitted) into the United States as refugees can seek an adjustment of status only under INA § 209.  *See* 8 C.F.R. § 209.1 (2002) ("The provisions of this section [implementing section 209 of the INA] shall provide the sole and exclusive procedure for adjustment of status by a refugee admitted under section 207 of the [INA] whose application is based on his or her refugee status.").  Section 209(a) provides that a refugee who has been physically present in the United States for at least one year and whose conditional admission status has not been previously terminated must return (or be returned) to INS custody for inspection and examination to determine eligibility for lawful permanent residency.  If, after conducting this examination, an immigration officer concludes that the alien seeking permanent residency "is not clearly and beyond a doubt entitled to be admitted," he or she must be detained for a removal proceeding.  *See* INA § 235(b)(2)(A), 8 U.S.C. § 1225(b)(2)(A) (2000).  The INS is free to charge the alien in the ensuing proceeding, which is overseen by an immigration judge, with any applicable ground of inadmissibility or deportability.  *See* INA § 240(a).

In the case at bar, the INS charged the respondent with being inadmissible by virtue of her conviction for a crime involving moral turpitude.  *See id.* § 212(a)(2)(A)(i)(I).  She did not contest this charge and, indeed, conceded her statutory inadmissibility.  Nevertheless, she sought a waiver pursuant to INA § 209(c), a provision empowering the Attorney General to waive most disqualifying barriers to an alien refugee's admissibility under INA § 212(a) "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest."[11]

---

[11]  In accordance with the governing regulatory scheme, the respondent initially submitted her
(continued...)

Although INA § 209(c) was enacted into law more than twenty years ago as part of the Refugee Act of 1980, Pub. L. No. 96-212, § 201(b), 94 Stat. 102, 106, there appears to be only one published decision discussing the merits of a requested discretionary waiver of inadmissibility under this provision. Specifically, in *Matter of H-N-*, Interim Decision 3414 (BIA 1999), the BIA upheld an immigration judge's grant of lawful permanent residency under INA § 209(c) to an otherwise inadmissible refugee who had been convicted of second-degree robbery. I find the majority opinion in *H-N-* to be wholly unconvincing. The majority there treated the applicant's crime – participation in a burglary in which one of the applicant's co-conspirators shot a woman to death in front of her children – as a virtual afterthought. Citing nothing more than the American citizenship of the applicant's children, the legal residency of her husband, and a number of letters from family and friends, the majority found "strong equities" in the applicant's favor and thus affirmed the immigration judge's discretionary grant of relief. The seriousness of the underlying offense was all but lost on the Board. Part II of the opinion of Board Member Filppu, who dissented from the decision to confer lawful permanent residency on the applicant, combines a far more thorough review of the record with a much greater appreciation of the harmfulness of the criminal conduct at issue, and reflects the result I would reach if that case were before me today.[12]

As deeply troubling as the ruling in *H-N-* is, I find the Board's decision in this case even more difficult to accept. The Board here cited testimony and "lengthy letters" provided by members of the respondent's family, as well as the fact that the respondent's husband and children are permanent legal residents, as evidence that her removal would cause the family "severe emotional hardship." BIA Decision (Mar. 1, 2001) at 2. On the strength of this scant summary, the Board found that she "met the standard for granting" a waiver of inadmissibility and an adjustment of status. *Id.*

---

(...continued)

application for an adjustment of status directly to the INS. *See* 8 C.F.R. § 209.1(b). After she received an adverse decision, she renewed the claim in her removal proceeding before an immigration judge. *See id.* § 209.1(e) ("There is no appeal of the denial of an application [for status adjustment] by the [INS], but such denial will be without prejudice to the alien's right to renew the application in removal proceedings under [INA § 240].").

[12] A threshold legal issue in *H-N-*, which was the focus of most of the opinions in that case, involved a jurisdictional issue regarding the authority of immigration judges and the Board to adjudicate waivers of inadmissibility under INA § 209(c). I do not address that issue here.

The Board's analysis, which makes no attempt to balance claims of hardship to the respondent's family against the gravity of her criminal offense, is grossly deficient. The opinion marginalizes the depravity of her crime, stating simply that the panel had "weighed the equities in this case against the respondent's criminal conviction" and concluded that discretionary relief was warranted. *Id.* Little or no significance appears to have been attached to the fact that the respondent confessed to beating and shaking a nineteen-month-old child to death, or that her confession was corroborated by a coroner's report documenting a wide-ranging collection of extraordinarily severe injuries.

To be sure, the respondent's removal will undoubtedly impose a strain on her family. Her husband and children testified as to the difficulties they experienced during her nearly six years of incarceration in the custody of the State of New York and the INS. Although the record makes clear that the respondent's family exhibited admirable strength and resiliency during that period, I do not doubt that her removal to Haiti will be a source of additional hardship for them. Administrative evaluations of requests for waivers of inadmissibility under INA § 209(c) cannot, however, focus solely on family hardships, but must consider the nature of the criminal offense that rendered an alien inadmissible in the first place.

In my judgment, that balance will nearly always require the denial of a request for discretionary relief from removal where an alien's criminal conduct is as serious as that of the respondent. Congress has *authorized* the Attorney General under section 209(c) to waive an alien's inadmissibility, notwithstanding certain otherwise disqualifying convictions, "for humanitarian reasons, to assure family unity, or when it is otherwise in the public interest." Congress did not *compel* the Attorney General to do so.[13] It would not be a prudent exercise of the discretion afforded to me by this provision to grant favorable adjustments of status to violent or dangerous individuals except in extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of status adjustment would result in exceptional and extremely unusual hardship. Moreover, depending on the gravity of the alien's underlying criminal offense, such a showing might still be insufficient. From

---

[13] By drafting INA § 209(c) to provide that the Attorney General "*may*" waive certain bars to admission, Congress clearly left this matter to my discretion. *Cf. Lopez v. Davis*, 531 U.S. 230, 238-42 (2001) (statute providing that Bureau of Prisons "may" reduce sentences of inmates completing drug treatment program imposes no obligation to do so and allows for categorical exclusions; application is left to the Bureau's sound discretion).

its inception, the United States has always been a nation of immigrants; it is one of our greatest strengths. But aliens arriving at our shores must understand that residency in the United States is a *privilege*, not a *right*. For those aliens, like the respondent, who engage in violent criminal acts during their stay here, this country will not offer its embrace. The BIA's grant of lawful permanent residency is reversed.

### B. Asylum

The respondent also sought asylum pursuant to INA § 208. Eligibility for such relief is restricted to aliens who may be classified as a "refugees" under the INA, *i.e.*, persons who are "unable or unwilling to return to [their native country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (2000); *see also* INA § 208(b)(1) ("The Attorney General may grant asylum to an alien . . . if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A)."). The applicant bears the burden of proving his or her "refugee" status. *See* 8 C.F.R. § 208.13(a) (2002).

Establishing "refugee" status is not the only hurdle an alien seeking asylum must clear in order to be considered eligible for such relief. Indeed, there are a series of exceptions outlined in INA § 208(b)(2) under which all aliens – including "refugees" – are statutorily barred from asylum. As relevant here, an alien convicted of a "particularly serious crime," defined for these purposes as any "aggravated felony," may not be granted asylum under any circumstances. *See* INA § 208(b)(2)(A)(ii), (B)(i). Furthermore, even if asylum eligibility is established, the decision whether to grant an application is committed to the Attorney General's discretion. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999).

The immigration judge declared the respondent ineligible for asylum for two independently sufficient reasons. First, he found that the respondent failed to demonstrate "a continuing[,] genuine and credible fear of persecution" if removed to Haiti or, alternatively, a history of persecution so severe as to justify an unwillingness to return there irrespective of current conditions in the country. IJ Decision (May 4, 2000) at 7. This finding is well-supported in the record.

The judge also found that the respondent had been convicted of an aggravated felony. Although Congress has delineated multiple categories of

offenses that constitute "aggravated felonies" – a term of art defined in INA § 101(a)(43), 8 U.S.C. § 1101(a)(43) (2000) – the only category pertinent here is "crimes of violence." *See* INA § 101(a)(43)(F) (an aggravated felony includes "a crime of violence (as defined in [18 U.S.C. § 16]) . . . for which the term of imprisonment [is] at least one year"). After examining the elements of the second-degree manslaughter statute to which the respondent pled guilty, the judge held that this offense represented a "crime of violence" and thus met the definition of an "aggravated felony."

The BIA subsequently rejected the immigration judge's "crime of violence" determination, concluding that the absence of a "substantial risk that physical force would be used in the commission of the crime" foreclosed such a characterization. I question the validity of the Board's reasoning. An individual is guilty of second-degree manslaughter under New York law when he or she "recklessly causes the death of another person." N.Y. Penal Law § 125.15(1) (McKinney 1998). At least two federal judges have squarely held that second-degree manslaughter in New York represents a "crime of violence" for purposes of the INA. *See Gibson v. Ashcroft*, No. 01-Civ-9400, 2002 WL 461579, at *3 (S.D.N.Y. Mar. 26, 2002); *Johnson v. Vomacka*, No. 97-Civ-5687, 2000 WL 1349251, at *4 (S.D.N.Y. Sept. 20, 2000).

Ultimately, however, it is unnecessary for me to resolve whether the respondent's conviction constitutes a "crime of violence" or whether she has otherwise satisfied the eligibility standards for asylum. Even assuming that the respondent not only qualifies as a "refugee," but that her criminal conviction does not preclude her eligibility, she is manifestly unfit for a *discretionary* grant of relief. For the same reasons articulated in the earlier discussion of the respondent's application for adjustment of status, I am highly disinclined to exercise my discretion – except, again, in extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of relief would result in exceptional and extremely unusual hardship – on behalf of dangerous or violent felons seeking asylum. As with applications for adjustment of status, even a showing of exceptional and extremely unusual hardship may be inadequate to justify a grant of asylum, depending on the nature of the alien's crime. The respondent's criminal conduct in connection with the homicide of R-J- is sufficiently severe as to make the conferral of asylum upon her entirely inappropriate. Her claim, therefore, is denied.

## C.  *Withholding of Removal*

Finally, the respondent asserts that she is legally entitled to withholding of removal pursuant to INA § 241(b)(3)(A), a statute prohibiting the Attorney General from returning an alien to a country where the alien's life or freedom would be threatened because of his or her race, religion, nationality, membership in a particular social group, or political opinion.  The applicant bears the burden of proving his or her right to such relief, 8 C.F.R. § 208.16(b), and must make the requisite showing by a preponderance of the evidence.  *Matter of S-V-*, Interim Decision 3430 (BIA 2000) (citing *Stevic*, 467 U.S. at 429-30).

As was the case with the respondent's asylum claim, the immigration judge and BIA disagreed over the impact of the respondent's criminal conviction on her threshold eligibility for withholding of removal.  INA § 241(b)(3)(B) provides that aliens convicted of any "aggravated felony" for which an aggregate term of imprisonment of at least five years was imposed are statutorily ineligible for withholding of removal.[14]  Based on the reasoning set forth in the preceding section, I find the Board's determination that second-degree manslaughter in New York is not a "crime of violence" (and thus not an "aggravated felony") to be quite suspect.  There is, as noted earlier, on-point authority to the contrary.

Once again, however, it is unnecessary for me to address the proper characterization of the respondent's criminal offense because there are other, clearer grounds for the denial of her claim for relief.  In particular, she has failed to prove that her life or freedom would be threatened in Haiti on the basis of race, religion, nationality, membership in a particular social group, or political opinion.

The respondent seeks to avail herself of the regulatory presumption of future persecution.  Under this doctrine, if an applicant can demonstrate that he or she "suffered past persecution in the proposed country of removal" on account of one of the five factors enumerated in section 241(b)(3)(A), then "it

---

[14] The respondent received an indeterminate two-to-six-year sentence upon her conviction for second-degree manslaughter.  Sentences for variable periods of time generally are treated as sentences for the maximum period specified.  *See, e.g.*, *United States v. Galicia-Delgado*, 130 F.3d 518, 520-21 (2d Cir. 1997); *People v. Washington*, 191 N.E. 7, 8 (N.Y. 1934).  In the immigration context in particular, the courts and the BIA, in applying statutory provisions that categorize crimes by length of incarceration, have found that indeterminate sentences should be treated as sentences for the maximum term imposed.  *See, e.g.*, *Picardo v. INS*, 104 F.3d 756, 759 (5th Cir. 1997); *Matter of S-S-*, 21 I&N Dec. 900, 901-03 (BIA 1997).

shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim." 8 C.F.R. § 208.16(b)(1)(i).[15]  This presumption may be rebutted, however, if the immigration judge finds, by a preponderance of the evidence, that:

(A)  There has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds mentioned in this paragraph upon the applicant's removal to that country; or

(B)  The applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so.

*Id.* § 208.16(b)(1)(i)(A), (B).

The respondent maintains that she is likely to be persecuted by members of the former Haitian Army as well as the Ton Ton Macoutes, a private Haitian death squad first organized by former President François Duvalier. To support this claim, the respondent and her husband testified at the removal hearing that the husband was assaulted and nearly killed in the early 1990s as a result of his work with the Fanmi Lavalas, a political party headed by then-opposition leader Jean-Bertrand Aristide.  They further alleged that Haitian soldiers burned the home shared by the respondent and her husband, as well as the homes of many of their relatives.  The soldiers also purportedly killed the father and two cousins of the respondent's husband.

Although clearly tragic, these events do not demonstrate that any past persecution was directed at the respondent.  As the immigration judge correctly noted, the attacks described at the hearing were all targeted at the respondent's *husband*, not at the respondent *herself*.[16]  IJ Decision (May 4, 2000) at 7.  The respondent did testify that she was a member of "Committee

---

[15]  If, on the other hand, an applicant cannot show that the fear of future threat to life or freedom is related to past persecution, then the applicant continues to bear the burden of proof that it is more likely than not he or she would suffer such harm in the future.  *See* 8 C.F.R. § 208.16(b)(1)(iii).

[16]  It bears noting here that the respondent never argued in her removal proceeding that a presumption of persecution could be established through an "imputed political opinion" theory – *i.e.*, that the alleged persecutors put her life or freedom in jeopardy because they attributed the political views of her husband to her.  *See, e.g.*, *Lwin v. INS*, 144 F.3d 505, 509-0 (7th Cir. 1998); *Sangha v. INS*, 103 F.3d 1482, 1489-0 (9th Cir. 1997).  Even if such a contention had been made, however, its merit would be questionable.  Indeed, the record suggests that the violence inflicted upon the respondent's home and non-blood relatives was committed in an effort to *find* the respondent's husband, not on account of political opinions attributed (erroneously or otherwise) to the respondent.

1991 Haiti," a social group supposedly regarded by the Haitian Army as an opposition political faction. *See* Hr'g Tr. (Feb. 11, 2000) at 92. Yet, she offered no evidence that this affiliation would have been sufficient to make her an independent target of either the Haitian Army or the Ton Ton Macoutes.

Furthermore, even assuming that the respondent could establish a presumption of future persecution based on the events detailed above, she still would be entitled to no relief here. The political climate in Haiti has changed dramatically since the respondent left in 1994, and it is no longer likely that her life or freedom would be threatened there. The respondent asserts that she is likely to suffer a loss of life or freedom at the hands of former Haitian Army soldiers or Ton Ton Macoute rebels if she returns to the country. The record, however, offers no solid basis for such a claim. The State Department's 1998 report on Haiti, which the respondent's counsel explicitly referenced at the removal hearing, documents the significant alteration of the Haitian political landscape since 1994. *See* Bureau of Democracy, Human Rights, and Labor, Dep't of State, *Country Report on Human Rights Practices – Haiti* (Feb. 1999). The Report recounts not only the disbanding of the Haitian Army in 1995, but also the 1997 election of President René Preval, the Fanmi Lavalas candidate who succeeded Jean-Bertrand Aristide in the first peaceful transfer of power between elected administrations in Haiti's post-independence history. It notes that the government, although beset by pockets of corruption, "generally respect[s] the human rights of its citizens." *Id.* at 2. The Haitian National Police force, the country's principal domestic law enforcement agency, is described as a flawed but improving organization. *Id.* Although excessive use of force by the police reportedly resulted in eleven deaths during 1998, the State Department concluded that "these killings generally were not political in character," but were instead largely attributable to poor training and discipline. *Id.* at 3.[17]

---

[17] The Report references only two instances of potentially politically-motivated violence against critics of the former military regime. The incident cited by the respondent as evidence of a continuing risk to her – *i.e.*, the shooting death of Father Jean Pierre Louis, whom the Report identifies as "an outspoken [critic] of the 1991-94 military regime" – is described as a possible political murder. Country Report at 4. The other incident involved Haitian National Police engaging in warrantless arrests and beatings of members of a political group allied with the Fanmi Lavalas. *Id.* These events occurred, however, in the aftermath of a riot during which members of the Fanmi Lavalas killed a police commissioner, burned his body, and stormed a prison. *Id.* at 4-5. There is no indication of any systemic threat to the lives or freedom of supporters of the current regime.

Although I am not required to investigate whether State Department publications that the respondent neither cited nor submitted could form the foundation of a claim for relief, I have examined the key publications and find they provide no such support. The Department of State's latest asylum profile on Haiti, published four years ago, describes dramatic human rights improvements in Haiti following the September 1994 international intervention to restore the country's democratically-elected government. *See* Bureau of Democracy, Human Rights, and Labor, Dep't of State, *Profile of Asylum Claims and Country Conditions – Haiti* (Mar. 31, 1998). The report states that "[t]he repression once found in Port-au-Prince and the countryside has been brought to an end, and people are no longer systematically subjected to human rights violations as an instrument of state policy." *Id.* at 5.

The State Department's most recent country report also fails to bolster the respondent's claim. *See* Bureau of Democracy, Human Rights, and Labor, Dep't of State, *Country Report on Human Rights Practices – Haiti* (Mar. 2002). That report points out that members of the former opposition party to which the respondent's husband belonged now occupy most key government positions, including the national law enforcement institutions. Moreover, Aristide was elected to a second term as President in February 2001, and the Fanmi Lavales maintained control of the Haitian Senate in the 2000 elections. In short, the record simply does not support the respondent's claim that her life or freedom would be threatened if she were returned to Haiti. Accordingly, her application for withholding of removal is denied.

IV.

For the foregoing reasons, the decision of the BIA is reversed and the case is remanded with instructions to dismiss the respondent's appeal.