# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-1981

_____

John Waldron

*Petitioner*

v.

Eric H. Holder, Jr., Attorney General of the United States

*Respondent*

_____

Petition for Review of an Order of Board of Immigration Appeals

_____

Submitted: March 15, 2012
Filed: August 6, 2012

_____

Before RILEY, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

John Waldron, a native and citizen of the United Kingdom, had his permanent resident status in the United States terminated because of his conviction for second degree assault. Waldron sought an adjustment of status and a waiver of inadmissibility. An immigration judge (IJ) concluded that Waldron was eligible for relief, granting both Waldron's adjustment of status and the waiver. The Department of Homeland Security (DHS) appealed the IJ's order to the Board of Immigration

Appeals (BIA), which reversed the IJ and ordered Waldron removed to the United Kingdom. Waldron petitions for review, arguing that the BIA erred by analyzing Waldron's waiver application under an "exceptional and extremely unusual hardship" standard. Waldron also contends that the BIA failed to apply the proper standard of review to the IJ's factual findings and engaged in improper factfinding. We agree with Waldron that the BIA failed to review the IJ's factual findings for clear error, and we remand for further proceedings.

I.

John Waldron entered the United States as a non-immigrant visitor in April of 2002. Waldron subsequently married a citizen of the United States, and his status was adjusted to conditional permanent resident in December of 2003. On January 1, 2005, Waldron and his wife, Tamara, attended a New Year's party at a restaurant in Saint Louis, Missouri. As they were attempting to leave the crowded venue, Waldron and another patron got into an argument that escalated into a physical altercation. During the altercation, Waldron struck the other man on the head with an empty martini glass. Waldron was arrested and charged with recklessly causing serious injury to another, which is a felony second degree assault under Mo. Rev. Stat. § 565.060.

On June 30, 2005, Waldron pled guilty to the charge. He was convicted and sentenced to one year of probation and 100 hours of community service. Later that year, Waldron submitted a petition to the DHS seeking to remove conditions on his residence in the United States. Because of Waldron's felony conviction, the DHS denied Waldron's petition. The DHS then served Waldron with a Notice to Appear, alleging that his conditional permanent resident status was terminated because of his conviction. The DHS subsequently charged Waldron with being subject to removal because: (1) Waldron's status as a conditional permanent resident had been terminated, pursuant to 8 U.S.C. § 1227(a)(1)(D)(i); and (2) Waldron had been

"convicted of a crime involving moral turpitude committed within five years" of his entry into the United States, pursuant to 8 U.S.C. § 1227(a)(2)(A)(i).

After the DHS placed Waldron in removal proceedings, Waldron conceded removability and sought an adjustment of status as the spouse of a United States citizen. Because Waldron was inadmissible under section 212(a)(2)(A)(i)(I) of the INA, see 8 U.S.C. § 1182(a)(2)(A)(i)(I) ("[A]ny alien convicted of . . . a crime involving moral turpitude . . . is inadmissible."), Waldron also filed an application for waiver on grounds of excludability under section 212(h) of the INA. Section 212(h) provides that certain grounds for inadmissibility, including the commission of a crime of moral turpitude, may be waived if "an immigrant who is the spouse [or] parent . . . of a citizen of the United States" demonstrates that his "denial of admission would result in extreme hardship to the United States citizen." 8 U.S.C. § 1182(h)(1)(B). At this point in time, the Waldrons had a two-year-old son, Samuel, who was a United States citizen.[1]

The IJ conducted several hearings on the merits of Waldron's application. Waldron, Tamara, and Tamara's mother all testified, and the Government offered no witnesses. Instead, the Government made the argument at the close of testimony that 8 C.F.R. § 1212.7(d) was "on point in this case" and that this regulation created "a higher burden for [Waldron] to meet which hasn't been met." On January 12, 2009, the IJ granted Waldron's request for a section 212(h) waiver and granted Waldron an adjustment of status to permanent resident. At the outset of its order, the IJ noted that section 212(h) required Waldron to show that Tamara or Samuel would suffer "extreme hardship" if Waldron were to be removed. The IJ also acknowledged that there is an even higher standard of "exceptional and extremely unusual hardship" that must be shown by aliens who have committed "violent or dangerous crimes" under 8 C.F.R. § 1212.7(d).

---

[1] Since these proceedings began, the Waldrons have had another son.

Based on testimony at the hearings and the evidence offered in support of Waldron's application, the IJ made the following findings of fact: (1) Waldron had established "exceptionally deep roots in his community and in the United States"; (2) if removed, Waldron would lose his job as a manager at a pharmaceutical company; (3) it would be "exceptionally hard" for Waldron to find comparable work in the United Kingdom, "especially during a recessionary period in their economy"; (4) if Waldron lost his job it would hinder his ability to support Tamara and Samuel, and he would not have the travel funds necessary to visit Samuel; (5) Waldron and Samuel have a very close father-son relationship; (6) if Waldron were removed, it would be difficult for him to travel to the United States on a regular basis to see Samuel; (7) if Waldron were removed and Samuel accompanied him, Samuel would lose regular contact with Tamara; (8) if the entire family relocated to the United Kingdom, Waldron and Tamara would not have the means of supporting Samuel; (9) Samuel "had a complicated medical history" and had required multiple hospitalizations and trips to the emergency room; (10) if Waldron were separated from Samuel, it could cause Samuel "additional physical and emotional harm"; (11) if Waldron were removed, Tamara would not be able to pay the mortgage on their home and could have great difficulty selling the house due to "a bad real estate market"; and (12) if the family relocated, it "would further disturb Samuel's healthy development and cause him extreme hardship." Implicit in many of these factual findings was the IJ's conclusion that Waldron and his family faced a serious risk of being separated from one another if Waldron were removed.

The IJ relied on these facts to find that Waldron merited an adjustment of status to permanent resident because his "solid professional career" at the pharmaceutical company and his loving, stable relationship with his wife and son outweighed his one instance of criminal behavior. The IJ then turned to Waldron's section 212(h) waiver request. First, the IJ found that Waldron's conviction was not for a "violent or dangerous crime" and that the normal section 212(h) standard of showing "extreme hardship" to Waldron's wife or son should apply to the waiver application. Second,

the IJ found that the facts gave rise to a finding that both Tamara and Samuel would suffer extreme hardship if Waldron were removed. The IJ added that "[e]ven if the Court found that [Waldron's] act was a violent or dangerous crime, he has demonstrated that he would suffer from extreme or unusual hardship if he were to be removed."[2]

The DHS appealed to the BIA, arguing that: (1) Waldron's assault conviction qualified as a "violent or dangerous crime" subject to the "exceptional and extremely unusual hardship" standard of 8 C.F.R. § 1212.7(d); and (2) Waldron failed to make the requisite showing for a section 212(h) waiver. At the outset, the BIA acknowledged that the IJ's findings of fact and credibility determinations were to be reviewed under the clearly erroneous standard. The BIA then agreed with the DHS that the heightened showing of "exceptional and extremely unusual hardship" applied because Waldron's crime qualified as "violent or dangerous" under 8 C.F.R. § 1212.7(d). The BIA reviewed the Missouri statute under which Waldron was convicted and noted that Waldron's "conduct in committing the crime consisted of hitting the victim over the head with a glass, which [the BIA] conclude[d] qualifies as violent or dangerous."

Next, the BIA analyzed Waldron's waiver application and concluded that Waldron failed to make the heightened showing of exceptional and extremely unusual hardship. The BIA explained that "although [Waldron] and his wife testified to the financial hardship that the family would suffer should [Waldron] be deported, we note that he is a manager at a pharmaceutical company, suggesting that he possesses transferable job skills, and that his wife demonstrated a history of gainful employment." Accordingly, the BIA found that any hardship to Waldron and his

_____

[2] Although the IJ's language did not precisely track the language of 8 C.F.R. § 1212.7(d), there is no dispute that the IJ was referring to the heightened standard imposed by that regulation.

family in relocating would fall short of the exceptional and extremely unusual hardship standard. The BIA then stated that "to the extent that [Waldron] presented evidence of hardship related to his son's medical history, we note that although the child had some medical conditions requiring repeated hospitalizations in 2008, the family did not report ongoing problems at the time of the respondent's hearing." The BIA also noted that "the record does not contain persuasive evidence indicating that [Waldron]'s immediate family would be forced to separate should he be removed or that they would experience exceptional and extremely unusual emotional hardship stemming from any relocation that might occur." The BIA concluded that Waldron had failed to demonstrate "exceptional and extremely unusual hardship," vacated the IJ's decision, and ordered Waldron removed to the United Kingdom.

One of the three Board Members dissented, citing In re Jean, 23 I. & N. Dec. 373 (A.G. 2002). Jean first articulated the heightened standard of showing "exceptional and extremely unusual hardship" that was later codified in 8 C.F.R. § 1212.7(d). See 23 I. & N. Dec. at 383 (applying the standard to an alien convicted of manslaughter of an infant child). The dissenting Board Member expressed the belief that 8 C.F.R. § 1212.7(d) should be read "in light of the unquestionably depraved conduct to which the standard was applied in Matter of Jean . . . . there is no explicit indication that the regulation was designed to cover an offense like [Waldron]'s that is markedly less serious than the one addressed in that case." Accordingly, the dissenting Board Member would have reviewed Waldron's waiver application for "extreme hardship" only and agreed with the IJ that this standard was met.

II.

Waldron petitions for review, raising two challenges to the BIA's decision: (1) the BIA erred in concluding that the heightened standard of "exceptional and extremely unusual hardship" should be used to analyze Waldron's waiver application;

and (2) the BIA failed to apply a "clearly erroneous" standard of review to the IJ's factual findings and engaged in improper factfinding. We address each argument in turn.

## A.

Waldron argues that the Board erred in applying a heightened standard of review under 8 C.F.R. § 1212.7(d). Waldron contends that the BIA first erred in determining that his conviction for second degree assault qualified as a "violent or dangerous crime" within the definition of 8 C.F.R. § 1212.7(d). According to Waldron, this resulted in the BIA further erring by examining Waldron's waiver application for the heightened showing of "exceptional and extremely unusual hardship."

In response, the Government argues that we cannot review Waldron's claims because of the jurisdictional bar in 8 U.S.C. § 1252(a)(2)(C), which prevents judicial review of "any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2)." The Government contends that Waldron is challenging the BIA's discretionary determination that Waldron failed to show "exceptional or extremely unusual hardship," which would be an issue shielded from our review. However, the jurisdictional bar does not preclude review of "constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(D). Here, the BIA's interpretation of "violent or dangerous crime" and the appropriateness of applying 8 C.F.R. § 1212.7(d)'s heightened standard in the first place are legal questions we may address pursuant to section 1252(a)(2)(D). See Mejia v. Gonzales, 499 F.3d 991, 999 (9th Cir. 2007) (finding that the court had jurisdiction to review whether the BIA erred in classifying the petitioner's crimes as "violent or dangerous" and then applying a heightened standard).

Waldron argues that his conviction for second degree assault was not a "violent or dangerous crime" under 8 C.F.R. § 1212.7(d). Waldron asserts that Jean provided a threshold definition for when a crime is "violent or dangerous" and that Waldron's crime does not rise to that level. Jean involved the brutal beating and shaking of an infant that resulted in the child's death from severe injuries. In re Jean, 23 I. & N. Dec. at 374-75. Because the holding of Jean resulted in 8 C.F.R. § 1212.7(d), Waldron contends that the regulation was meant to create "a heightened hardship standard for the worst criminal offenders where substantial injury inflicted was clearly the point." He argues, as a matter of law, that he does not belong in this category.

"We give substantial deference to the BIA's interpretation of its statutes and regulations." Averianova v. Mukasey, 509 F.3d 890, 897 (8th Cir. 2007). We must defer to the BIA's interpretation of 8 C.F.R. § 1212.7(d) unless it is "'plainly erroneous or inconsistent with the regulation.'" Hailemichael v. Gonzales, 454 F.3d 878, 883 (8th Cir. 2006) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)). The plain language of 8 C.F.R. § 1212.7(d) states that the heightened standard of showing "exceptional and extremely unusual hardship" applies to aliens seeking a waiver of inadmissibility who have been involved in "violent or dangerous crimes." The regulation says nothing about the standard being applicable to only "the worst criminal offenders" or only to those who intended to cause substantial injury; the only criteria identified in the regulation is that the alien's crime be "violent or dangerous." Waldron was convicted of violating Mo. Rev. Stat. § 565.060, which covers a variety of knowing and reckless conduct that either causes serious injury or places a person in danger of serious injury. As the BIA observed, "all of the culpable reckless conduct covered by the statute is dangerous conduct, in that it either places others at substantial risk of death or causes actual physical injury of a significant nature." The BIA also looked at the actual offense conduct in Waldron's case and concluded that "hitting the victim over the head with a glass . . . qualifies as violent or dangerous."

We agree that Waldron's crime was not as serious as the one at issue in Jean. However, the plain language of 8 C.F.R. § 1212.7(d) clearly applies to "violent or dangerous crimes." Based on the statute Waldon was convicted under and the actual offense conduct, the BIA did not plainly err in concluding that Waldron committed a "violent or dangerous crime" under 8 C.F.R. § 1212.7(d). Accordingly, the BIA properly subjected Waldron's waiver application to the heightened standard of demonstrating "exceptional and extremely unusual hardship."

B.

Waldron also argues that the BIA failed to review the IJ's factual findings for clear error. He contends that the BIA inappropriately found facts that were then relied upon in the BIA's analysis of whether Waldron demonstrated "exceptional and extremely unusual hardship." In particular, Waldron takes issue with the BIA's statement that Waldron "is a manager at a pharmaceutical company, suggesting that he possesses transferable job skills" and the BIA's observation that "although [Waldron's] child had some medical conditions requiring repeated hospitalizations in 2008, the family did not report on-going problems at the time of the respondent's hearing."

Before we address the merits of Waldron's argument, we must again address the jurisdictional bar of section 1252(a)(2). The determination that a petitioner has failed to satisfy the "exceptional and extremely unusual hardship" standard "is precisely the discretionary determination that Congress shielded from our review." Gomez-Perez v. Holder, 569 F.3d 370, 373 (8th Cir. 2009) (citation and quotation marks omitted). Yet we retain jurisdiction to address the legal question of whether the BIA applied the correct standard of review when reviewing the IJ's factual findings. See Ramirez-Peyro v. Gonzales, 477 F.3d 637, 640 (8th Cir. 2007) (evaluating whether the BIA properly reviewed the IJ's factual findings for clear error).

-9-

The BIA has the authority to conduct de novo review of questions of law, discretion, and judgment. 8 C.F.R. § 1003.1(d)(3)(ii). However, "[f]acts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous." 8 C.F.R. § 1003.1(d)(3)(i). The IJ's findings of fact "may not be overturned simply because the Board would have weighed the evidence differently or decided the facts differently had it been the factfinder." In re R-S-H, 23 I. & N. Dec. 629, 637 (BIA 2003) (citation and quotation marks omitted). "[T]he BIA does not have authority to engage in factfinding, except to take administrative notice of commonly known facts." Nabulwala v. Gonzales, 481 F.3d 1115, 1118 (8th Cir. 2007) (citing 8 C.F.R. § 1003.1(d)(3)(iv)).

Although the BIA set forth the correct standard of review at the outset of its decision, we agree with Waldron that it deviated from this standard. The BIA did not conclude that there was clear error in the IJ's express finding that it would be "exceptionally hard" for Waldron to find a comparable job in the United Kingdom. Nor did the BIA squarely address the evidence on which the IJ based its finding, which included testimony from Waldron that if he managed to find employment, it would be "on the bottom [of] the ladder" and for significantly less money. Instead, the BIA engaged in its own factfinding by stating that Waldron's role as a manager gave him "transferable job skills," despite Waldron's express testimony that most of his work involved the FDA and that his expertise in the American pharmaceutical industry would not be transferable to jobs in England. If the BIA did not wish to rely on the IJ's finding that it would be "exceptionally hard for [Waldron] to find comparable work" or on the IJ's finding that Waldron "would lose the ability to help support his son" if he were removed, it needed to explain why those determinations were clearly erroneous based on the evidence presented to the IJ.

The BIA also engaged in inappropriate factfinding when it concluded that Waldron "did not report on-going problems [regarding Samuel's health] at the time

-10-

of [Waldron]'s hearing." This seems to conflict with the IJ's determination, based on a letter from Samuel's pediatrician, that Waldron's removal "could cause additional physical and emotional harm to Samuel and put him at risk." It also conflicts with the IJ's finding that if the Waldron family were to relocate, it "would further disturb Samuel's healthy development and cause him extreme hardship."

Finally, the BIA's statement that there was insufficient evidence that "the respondent's immediate family would be forced to separate should he be removed," was an improper finding of fact that inherently contradicts many of the IJ's factual findings. The IJ's findings of fact implicitly acknowledged a danger that Waldron's removal could result in his separation from his immediate family, and the IJ's hardship analysis under section 212(h) made reference to this danger. Admittedly, the IJ did not make an express finding as to the specific likelihood that Waldron's removal would result in separation from his immediate family, and there is testimony in the record suggesting that Waldron's family would accompany him to the United Kingdom in the event of his removal. However, if the BIA concluded that the IJ erred by not specifically addressing the probability that Waldron and his family would be separated, it should have remanded the case to the IJ for further factfinding on this point. See Ramirez-Peyro, 477 F.3d at 641.

We acknowledge that the BIA has the discretion to weigh the IJ's factual findings differently than the IJ when making the ultimate determination of whether an applicant demonstrated "exceptional or extremely unusual hardship" under 8 C.F.R. § 1212.7(d). However, it may not disregard the IJ's factual findings and supplant them with its own, absent a finding of clear error. The Government argues that the BIA was simply "weighing the facts differently," but there is a difference between weighing the factual findings of the IJ and reweighing the underlying evidence and testimony behind those factual findings to reach new factual conclusions. In the absence of any clear error, the BIA's role was to accept the facts as found by the IJ and determine de novo whether those facts rose to the level of

"exceptional and extremely unusual hardship" as a matter of law. <u>See</u> 8 C.F.R. § 1003.1(d)(3). That role was not properly executed. Accordingly, we remand this case so that the BIA has "the opportunity to discharge its statutory duty to review the IJ's factual findings for clear error and remand to the IJ for further proceedings if appropriate." <u>Ramirez-Peyro</u>, 477 F.3d at 642.

## III.

For the foregoing reasons, we grant Waldron's petition for review and remand his case to the BIA for further proceedings consistent with this opinion.

_____