In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 05-1194

AHMED ALI,

*Petitioner-Appellant,*

*v.*

DEBORAH ACHIM, MICHAEL CHERTOFF,
and ALBERTO GONZALES,

*Respondents-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 2772—**Amy J. St. Eve**, *Judge.*

———————

Nos. 05-2028 & 05-3009

AHMED ALI,

*Petitioner,*

*v.*

ALBERTO GONZALES,

*Respondent.*

———————

Petitions for Review of Orders of the
Board of Immigration Appeals.
No. A77-607-113.

———————

ARGUED JANUARY 9, 2006—DECIDED NOVEMBER 6, 2006

———————

Before POSNER, EVANS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.*  Ahmed Ali petitions for review from the Board of Immigration Appeals' ("BIA") final decision ordering him removed to his native Somalia. He also appeals from an order of the United States District Court for the Northern District of Illinois denying his habeas corpus petition in which he challenged his prolonged preremoval detention. The government released Ali from custody shortly before this case was argued, so the habeas detention challenge is moot and we review only the decision of the BIA ordering his removal to Somalia. For the reasons that follow, we deny the petition for review with respect to the BIA's denial of waiver of inadmissibility, asylum, and withholding of removal. We grant the petition with respect to the BIA's denial of deferral of removal under the Convention Against Torture ("CAT") and remand that claim for further proceedings.

## I. Background

Ali was born in 1980 in Baidoa, Somalia, to a family belonging to the minority Rahanweyn clan and the Digil subclan. Since the collapse of its central government in 1991, Somalia has been afflicted by interclan and intraclan warfare. U.S. STATE DEP'T COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES (SOMALIA) 2 (Mar. 2006). The State Department Country Report specifically highlights deadly infighting among subfactions of the Rahanweyn Resistance Army in the southern regions of Bay and Bakool. Ali's hometown of Baidoa is located in the Bay region.

According to the uncontradicted testimony of Dr. Said Samatar, a professor of African History at Rutgers University who gave his expert opinion at Ali's immigration hearing, if Ali were returned to the areas of Somalia controlled by his Rahanweyn clan, "he would face immediate and present danger" because the region "is in dispute by

two factions of the Rahanweyn." By "immediate and present danger" he meant Ali was likely to be beaten and robbed and, "in many places," would also be targeted for death. Dr. Samatar indicated Ali would likely be singled out to be beaten, robbed, or killed because he would be perceived as wealthy after spending time in the United States and "because of the intricacy of [his] lineage." Regarding this latter point, he described persistent feuds between subfactions of the Rahanweyn based on lineage, and testified that the infighting among the Rahanweyn "depends on . . . your clan lineage." Dr. Samatar testified that Ali would fare no better in another part of Somalia not controlled by the Rahanweyn. In non-Rahanweyn-controlled regions, he said, Ali would be targeted by members of the local dominant clan because of his status as a Rahanweyn.

Shortly after the outbreak of clan-based violence in 1991, two of Ali's brothers were killed—one by a stray bullet, the other by street gangs. In 1994 warlords from the dominant Hawiye clan who were affiliated with the United Somali Congress ("USC") invaded Baidoa. USC soldiers shot at Ali on two or three occasions, and he describes "constantly running from the USC military" as a teenager. Hawiye militiamen subjected him to several beatings. In 1996, when Ali was sixteen years old, USC soldiers raided the Ali family's home in Baidoa and attempted to rape Ali's older sister. When she resisted, they killed her. Both the attempted rape and murder happened in front of Ali.

Soon after his sister's murder, Ali and the rest of his family fled to a town near the Somali-Kenyan border. There they again experienced clan-based persecution, this time at the hands of the Darod clan. The Rahanweyn were easily identified by the Darods because they spoke a different dialect. In one incident, a member of the Darod militia demanded that Ali put his penis into an exhaust pipe; Ali refused and was beaten. He understood this kind of abuse

as an attempt to humiliate the members of minority clans like the Rahanweyn.

In 1998 Ali and his family fled to Kenya, and in 1999 the United States admitted them as refugees. Ali settled in Madison, Wisconsin, with one of his sisters; his parents moved to Minnesota. He worked a variety of jobs in Madison and attended the Madison Area Technical College. Even after moving to Madison, however, Ali suffered nightmares about the atrocities he witnessed and experienced in Somalia, especially his sister's murder. He says the nightmares caused him to develop a drinking problem and to struggle with depression and insomnia.

Ali was involved in a string of altercations in Madison, starting with an incident in April 2000 where he accepted a ride in a car from three men and a woman. They drove him to a park in Madison, beat him up, and hit him with a beer bottle. His lip was cut and he received medical treatment at a hospital. Two months later Ali crossed paths with one of the men from the April 2000 incident. They started to fight, the police responded, and both Ali and the other man were cited for disorderly conduct.

Then, on June 30, 2000, Ali got into yet another fight with the same man when he spotted him on State Street in downtown Madison. Ali gave the following statement to police officers investigating the incident: "If someone does something to you, you don't forget. I knew it was a mistake and I went after him and I punched him first and he put me on the ground and that's when I got the knot on my head and it was an eye for an eye yesterday." During this altercation, Ali produced a box-cutting instrument and cut the other man about the face, chest, hand, shoulder, and back, saying, "I'm gonna kill you all."

Ali was arrested and charged in Dane County Circuit Court with substantial battery with intent to cause sub-

stantial bodily harm by using a dangerous weapon in violation of sections 940.19(3) and 939.63 of the Wisconsin Statutes. He was released on his own recognizance on condition that he not return to the vicinity of State Street where the June 30 fight occurred. Ali violated this condition by going to State Street—he says he was there to catch a bus to school—and he was again arrested and released. During this period of release, Ali was diagnosed with posttraumatic stress disorder caused by his experiences in Somalia.

Ali pleaded no contest to the felony charge of substantial battery with a dangerous weapon and was placed on probation for seven years and ordered to serve an eleven-month term of incarceration in the local work release facility. Ali completed his eleven-month term in June 2002 and was turned over to federal immigration authorities who initiated removal proceedings against him because of his felony battery conviction.

Ali conceded removability on account of his conviction, but sought relief from removal in the form of a waiver of inadmissibility, asylum, withholding of removal, and deferral of removal under the CAT. After two-and-a-half years of administrative proceedings, the BIA ultimately denied all of Ali's claims for relief. The BIA applied the standard set forth in *Matter of Jean*, 23 I. & N. Dec. 373 (A.G. 2002), to deny Ali a waiver of inadmissibility because he committed a violent crime and had not shown an "exceptional and extremely unusual hardship." Citing Ali's conviction for substantial battery with a dangerous weapon, the BIA also found him ineligible for asylum and withholding of removal because he had committed a "particularly serious crime." Finally, the BIA refused to grant Ali deferral of removal under the CAT because it concluded he had not shown he would more likely than not suffer torture if returned to Somalia. Ali petitioned this court for review.

## II. Discussion

### A. Jurisdiction to review discretionary decisions

The government first challenges our jurisdiction to consider the BIA's discretionary decisions denying waiver of inadmissibility and finding Ali ineligible for asylum and withholding of removal. Section 1252(a)(2)(B) generally deprives courts of jurisdiction to review discretionary denials of immigration relief, and § 1252(a)(2)(C) strips courts of jurisdiction to review final removal orders against aliens who are removable by reason of having committed certain crimes. 8 U.S.C. § 1252(a)(2)(B), (C). But there is an exception for constitutional claims and questions of law: the statute provides that neither subparagraph (B) or (C) of § 1252(a)(2) precludes judicial "review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals." 8 U.S.C. § 1252(a)(2)(D); *Sokolov v. Gonzales*, 442 F.3d 566, 569 (7th Cir. 2006).

So while we lack jurisdiction to review the Attorney General's exercise of discretion to grant or deny relief to an alien (or, more commonly, the discretionary decision of the BIA acting on the Attorney General's behalf), we retain jurisdiction to examine whether the correct legal standard was applied to the alien's claim for relief. *See Jean v. Gonzales*, 452 F.3d 392, 396 (5th Cir. 2006). Accordingly, we proceed to Ali's argument that the BIA evaluated his claims using improper legal standards.

### B. *Matter of Jean* standard

An alien who commits a "crime of moral turpitude" generally may not be admitted to the United States.[1]

---

[1] Ali concedes that his conviction for substantial battery with a dangerous weapon was a crime of moral turpitude.

8 U.S.C. § 1182(a)(2)(A)(i)(I). But Congress has given the Attorney General and the Secretary of Homeland Security permissive discretion to waive a refugee's inadmissibility "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." 8 U.S.C. § 1159(c). In *Matter of Jean*, 23 I. & N. Dec. 373 (A.G. 2002), the Attorney General declined to waive inadmissibility for a Haitian refugee who pleaded guilty to second-degree manslaughter after beating and shaking a nineteen-month-old child to death. *Matter of Jean*, 23 I. & N. Dec. at 374-75. The Attorney General articulated a heightened standard for waiving the inadmissibility of refugees who have been convicted of violent or dangerous crimes. Under the *Matter of Jean* standard, aliens convicted of "violent or dangerous" criminal acts will not be allowed to adjust their status under § 1159(c) "except in extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of status adjustment would result in exceptional and extremely unusual hardship." *Matter of Jean*, 23 I. & N. Dec. at 383.

Ali argues that the heightened standard established in *Matter of Jean* for waiving the inadmissibility of refugees who commit violent crimes is inconsistent with and unauthorized by § 1159(c). He contends the BIA should have evaluated his request for a waiver of inadmissibility by looking at the totality of the circumstances in his case, including his family's experiences in Somalia, his posttraumatic stress disorder, his victim's previous attack against him, and his ties to family in the United States. He asserts that § 1159(c) spells out a "three-part test" for inadmissibility waivers that the BIA was required to follow.

We think Ali reads too much into the statute and overstates the scope of the *Matter of Jean* standard. First, § 1159(c) does not contain a "three-part test," nor does it direct the Attorney General to conduct a "totality of the

circumstances" analysis when deciding whether to grant an inadmissibility waiver. The statute says the Attorney General or Secretary of Homeland Security "*may* waive" a refugee's inadmissibility for "humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." 8 U.S.C. § 1159(c) (emphasis added). Nowhere does the statute require the Attorney General to waive any refugee's inadmissibility; the language is completely permissive, giving the Attorney General the discretion to decide on a case-by-case basis whether to grant relief for any of the three listed reasons.

After we heard oral argument in this case, two other federal courts of appeals considered similar challenges to the *Matter of Jean* standard and rejected them in published opinions. In the first of these decisions, *Rivas-Gomez v. Gonzales*, 441 F.3d 1072 (9th Cir. 2006), the Ninth Circuit observed that the Attorney General possesses "broad discretion to grant or deny waivers and may establish general standards governing the exercise of such discretion 'as long as these standards are rationally related to the statutory scheme.'" *Id.* at 1078 (quoting *Ayala-Chavez v. INS*, 944 F.2d 638, 641 (9th Cir. 1991)). The court approved *Matter of Jean*'s heightened waiver standard for refugees who commit violent crimes because it found the standard was rationally related to the "national immigration policy of not admitting aliens who would be a danger to society." *Rivas-Gomez*, 441 F.3d at 1078.

The Fifth Circuit reached the same conclusion in *Jean v. Gonzales*, 452 F.3d at 396-98. This was petitioner Jean's appeal from the Attorney General's decision in *Matter of Jean*. Jean argued, as Ali does here, that the Attorney General's heightened standard for refugees who commit violent crimes was not authorized by 8 U.S.C. § 1159(c). The Fifth Circuit disagreed because "the Attorney General did not add a class of aliens to those who are statutorily inadmissible for waiver, nor did he instruct the BIA

to ignore statutory considerations of family unity, humanitarian concerns, and public interest." *Jean*, 452 F.3d at 397 (citing *Togbah v. Ashcroft*, 104 Fed. Appx. 788, 794 (3d Cir. 2004) (unpublished)). Because *Matter of Jean*'s heightened waiver standard for violent criminal refugees was "rational and connected to the statutory scheme," the Fifth Circuit held the Attorney General permissibly exercised the broad discretion conferred upon him by § 1159(c). *Id.*

We agree with our sister circuits that the Attorney General did not exceed his statutory authority when he articulated the heightened waiver standard in *Matter of Jean*. The *Matter of Jean* standard is not like the regulation successfully challenged in *Succar v. Ashcroft*, 394 F.3d 8 (1st Cir. 2005), a case on which Ali relies. *Succar* held that where 8 U.S.C. § 1255(a) lists categories of aliens who may apply to the Attorney General for a discretionary adjustment of immigration status, the Attorney General—in the exercise of that discretion—may not promulgate a regulation that effectively amends the statute by completely barring subcategories of aliens from applying for adjustment. *Succar*, 394 F.3d at 21. The court found such a regulation would contradict the statute because § 1255(a) did not give the Attorney General the discretion to decide who could *apply* for adjustment, it only gave him the discretion to decide who should be *granted* adjustment. *Id.* at 28.

But in *Matter of Jean* the Attorney General did not categorically exclude violent or dangerous criminal refugees from applying for an inadmissibility waiver, nor from being granted such a waiver. *Matter of Jean* simply says the Attorney General will, in the exercise of his statutorily conferred discretion, require a more compelling showing of hardship from refugees who make themselves inadmissible by committing violent crimes. *Jean*, 23 I. & N. Dec. at 383. *Succar* itself spells out this distinction: "Congress's eligibility determinations do not limit the considerations that may

guide the Attorney General in exercising his discretion to determine who, among those eligible, will be accorded grace." *Succar*, 394 F.3d at 29 n.28 (quotation marks and citations omitted). *See also Jean*, 452 F.3d at 397 ("[T]he Attorney General did not add a class of aliens to those who are statutorily inadmissible for waiver . . . . He left open the possibility that even the most violent and dangerous immigrants could be granted relief in an appropriate case."). The Attorney General acted within the discretion conferred by § 1159(c) when he established the heightened waiver standard for violent or dangerous criminal refugees in *Matter of Jean*.

## C.  A "particularly serious crime"

Ali next argues that the BIA erred when it found he committed a "particularly serious crime," a finding that made him ineligible for asylum and withholding of removal. The immigration statutes give the Attorney General—by extension, the BIA—discretion to determine whether aliens are eligible to receive asylum and withholding of removal. 8 U.S.C. §§ 1158(b)(2)(A)(ii) and 1231(b)(3) (B)(ii).[2] As we have noted, courts generally lack jurisdiction to review the Attorney General's discretionary immigration decisions, but § 1252(a)(2)(D) authorizes us to address the questions of law raised by Ali's challenge to the BIA's finding that he committed a particularly serious crime.

Ali's appeal presents questions of law because he challenges the BIA's interpretation of the term "particularly serious crime" in the asylum and withholding statutes. He

---

[2]  Withholding of removal is a mandatory form of relief to which eligible applicants are entitled, 8 U.S.C. § 1231(b)(3)(A), but the Attorney General has discretion to determine who is eligible. 8 U.S.C. § 1231(b)(3)(B).

argues that the plain language of those statutes should have precluded the BIA from holding that his conviction for substantial battery with a dangerous weapon constituted a "particularly serious crime." Where, as here, we are asked to review " 'an agency's construction of the statute which it administers,' " we apply "the principles of deference described in *Chevron U.S.A. v. Natural Resources, Defense Council, Inc.*, 467 U.S. 837, 842 (1984)." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999) (quoting *Chevron*, 467 U.S. at 842).

If the statute at issue speaks clearly and directly to the question at hand, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. But when "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. An agency's interpretation of an ambiguous statute may be permissible even if it differs from the construction the reviewing court would have given the statute "if the question initially had arisen in a judicial proceeding." *Id.* at 843 n.11. We give "considerable weight . . . to an executive department's construction of a statutory scheme it is entrusted to administer," *id.* at 844, and deference to the executive "is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.' " *Aguirre-Aguirre*, 526 U.S. at 425 (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988)).

Ali urges us to hold that the asylum and withholding statutes are unambiguous, that his crime of conviction is not a "particularly serious crime" within the meaning of §§ 1158(b)(2) and 1231(b)(3), and that the BIA's interpretation of these statutes is not entitled to judicial deference. The asylum statute says that an alien is ineligible for asylum "if the Attorney General determines that . . . (ii) the

alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." 8 U.S.C. § 1158(b)(2)(A)(ii). Neither § 1158 nor any other section of the immigration code offers a definition of the statutory phrase "particularly serious crime," but § 1158 does list two categories of crimes that are per se "particularly serious": (1) "aggravated felon[ies]" and (2) other crimes that the Attorney General "designate[s] by regulation." 8 U.S.C. §§ 1158(b)(2)(B). Ali would have us read subparagraph (b)(2)(B) to mean that *only* aggravated felonies and other crimes specifically designated by regulation may be considered "particularly serious."[3]

We do not think § 1158 so cabins the Attorney General's discretion to determine whether an alien has been convicted of a "particularly serious crime" for purposes of ineligibility for asylum. Congress named two categories of per se "particularly serious" crimes, but it did not say these were the *only* categories of crimes that would bring an alien's case within the statutory bar. Nowhere does § 1158 purport to prohibit the Attorney General from determining in a given case that an alien's nonaggravated felony is "particularly serious" unless he had the foresight to explicitly itemize that particular crime by regulation. The statutory language simply is not susceptible to such a limited interpretation. We therefore reject Ali's argument that the BIA misinterpreted an unambiguous statute. Alternatively, to the extent there is any ambiguity, the BIA's interpretation is entitled to considerable deference. *Chevron*, 467 U.S. at 844.

---

[3] The parties agree that Ali's crime of conviction was neither an aggravated felony (as that term is defined for immigration purposes) nor a crime the Attorney General has by regulation designated as "particularly serious."

In this regard, the BIA's construction of § 1158(b)(2) is entirely permissible, particularly considering the vast array of crimes defined by each of the fifty states' criminal codes. An interpretation that requires the Attorney General and his agents to sift through each state's code and prospectively identify by regulation every single crime that would qualify as "particularly serious" would impose an onerous burden. Nothing in the statute's text suggests a requirement that the Attorney General must engage in such an anticipatory task. Section 1158(b)(2) does not prohibit the Attorney General from determining on a case-by-case basis that an asylum applicant has committed a "particularly serious" crime, even though the crime is neither an aggravated felony nor a crime expressly designated by regulation as "particularly serious."

We reach the same conclusion with respect to the withholding of removal statute, 8 U.S.C. § 1231(b)(3)(B). That statute says an alien is ineligible for withholding of removal if "the Attorney General decides that . . . (ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." Subparagraph (b)(3)(B) adds the following about the "particularly serious crime" exclusion:

> For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

8 U.S.C. § 1231(b)(3)(B).

Ali reads this language to mean that only aggravated felonies count as particularly serious crimes for purposes of

withholding of removal ineligibility. He notes that the statute makes aggravated felonies resulting in prison terms of at least five years per se "particularly serious." The next sentence gives the Attorney General discretion to decide that a crime is particularly serious even if the alien was not sentenced to at least five years in prison. But, Ali observes, that same sentence says nothing about giving the Attorney General discretion to call a crime particularly serious when it is not an "aggravated felony." Ali invokes the canon of construction that says the expression of one thing is the exclusion of the other. *See, e.g.*, *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 861 n.15 (*expressio unius est exclusio alterius*). He reasons that because the statute expressly grants the Attorney General discretion to find aggravated felonies "particularly serious" regardless of the length of an alien's sentence but does not explicitly provide any similar discretion for crimes that are not aggravated felonies, § 1231(b)(3)(B) precludes the Attorney General from finding any crimes "particularly serious" other than aggravated felonies.

The problem with this argument is that § 1231 does not state a general rule that only aggravated felonies can be considered "particularly serious" crimes. The designation of aggravated felonies producing sentences of at least five years' imprisonment as per se "particularly serious" creates no presumption that the Attorney General may not exercise discretion on a case-by-case basis to decide that other nonaggravated-felony crimes are also "particularly serious." Congress specified that the Attorney General may extend the "particularly serious" designation to aggravated felonies producing prison terms of less than five years. But the absence of a similar provision for nonaggravated-felony crimes does not imply that only aggravated felonies can qualify as "particularly serious" crimes. Again, to the extent that § 1231(b)(3)(B) is ambiguous on this point, the BIA's reasonable interpretation is entitled to deference. *Chevron*, 467 U.S. at 844.

The BIA acted in accordance with §§ 1158 and 1231 and did not apply an incorrect legal standard when it determined that Ali committed a "particularly serious" crime for purposes of ineligibility for asylum and withholding of removal. We lack jurisdiction to review the BIA's exercise of discretion when the agency operates under the proper legal standard. 8 U.S.C. § 1252(a)(2)(B) and (C). We therefore do not address Ali's argument that the BIA misapplied its own precedent—*Matter of Frentescu*, 18 I. & N. Dec. 244 (1982)[4]—in its analysis of Ali's offense of conviction. Reviewing the BIA's determination in this regard would require an improper assertion of jurisdiction over the BIA's exercise of its statutorily conferred discretion. *But see Afridi v. Gonzales*, 442 F.3d 1212, 1218-20 (9th Cir. 2006) (asserting jurisdiction then granting petition for review and remanding alien's withholding of removal claim because BIA did not fully engage the *Frentescu* factors when deciding alien's crime was "particularly serious").

## D.  International law

Ali spends two sentences in his opening brief arguing that the BIA's decision violates international standards for denying relief to criminal refugees, but his cursory argument provides no basis for granting his petition. The only authority he cites is the *Office of the High Commis-*

---

[4] "While there are crimes which, on their face, are 'particularly serious crimes' or clearly are not 'particularly serious crimes,' the record in most proceedings will have to be analyzed on a case-by-case basis. In judging the seriousness of a crime, we look to such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community." *Matter of Frentescu*, 18 I. & N. Dec. 244, 247 (1982).

*sioner for Human Refugees, Handbook on Procedures and Criteria for Determining Refugee Status*, ¶ 154, which "is not binding on the Attorney General, the BIA, or United States courts." *Aguirre-Aguirre*, 526 U.S. at 427.

### E. Deferral of removal under the Convention Against Torture

Finally, we address Ali's contention that the BIA should have granted him deferral of removal under the CAT, implemented at 8 C.F.R. §§ 1208.16-18.[5] The BIA denied Ali relief under the CAT because it determined that he had not shown he would more likely than not face torture if removed to Somalia. We review the BIA's factual findings for substantial evidence; this means we will reverse the BIA's decision only if the evidence in the record compels a contrary conclusion. *Jun Ying Wang v. Gonzales*, 445 F.3d 993, 997 (7th Cir. 2006).

Ali is entitled to deferral of removal—the relief is mandatory, not discretionary—if he can prove that it is more likely than not he would be tortured if removed to Somalia. 8 C.F.R. § 1208.16(c)(2) and (4). The BIA was required to consider "all evidence relevant to the possibility of future torture . . . including, but not limited to" evidence that Ali suffered past torture, evidence that he could relocate to a

---

[5]  Deferral of removal under the CAT is a limited form of protection available only to aliens who are barred from receiving withholding of removal. 8 C.F.R. § 1208.17(a). Deferral of removal does not confer permanent immigration status on an alien, and an alien who has been granted this form of relief may be removed to another country where there is no likelihood of torture. 8 C.F.R. § 1208.17(b)(2). Also, deferral of removal is subject to termination if an immigration judge determines that there is no longer a likelihood of torture in the country to which removal has been deferred. 8 C.F.R. § 1208.17(b)(1).

part of Somalia where he is not likely to be tortured, evidence of "gross, flagrant or mass violations of human rights" in Somalia, and other relevant information about Somalia's country conditions. 8 C.F.R. § 1208.16(c)(3). For purposes of the CAT, torture has the following definition:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1). Mental pain or suffering constitutes torture if it results from, among other things, the "intentional infliction or threatened infliction of severe physical pain or suffering," the "threat of imminent death," and the "threat that another person will imminently be subjected to death, severe physical pain or suffering." 8 C.F.R. § 1208.18(a)(4). The requirement that torture be inflicted by or with the acquiescence of a public official is met if "prior to the activity constituting torture," a public official is aware of the activity and then "breach[es] his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7).

The BIA acknowledged that Ali "would probably face [clan-based] harm and possibly torture if returned to live for prolonged periods in certain areas" of Somalia that are not controlled by the Rahanweyn. But the Board concluded the only risks to which Ali would be exposed in the Rahanweyn-controlled areas would be based on his perceived wealth for having lived in the United States or

because of the random violence and looting that plagues the Bay and Bakool regions. In the BIA's view, violence would not be inflicted for the purpose of causing severe mental or physical pain or suffering, and would not be motivated by the desire to obtain from Ali a confession or information, to punish or coerce him, or to discriminate against him. *See* 8 C.F.R. § 1208.18(a)(1) (requiring "torture" to be attributable to these motives). Accordingly, the BIA found Ali had not shown he was more likely than not to face torture if removed to Somalia and denied relief under the CAT.

The BIA reached these conclusions by ignoring key evidence, overlooking Dr. Samatar's testimony that Ali would be targeted for violence in the Rahanweyn-controlled areas because of his particular lineage within his clan, not just for being perceived as wealthy for having lived in the United States. The BIA failed to take into account Dr. Samatar's testimony that the Rahanweyn infighting "depends on . . . your clan lineage" and that violence and torture are perpetrated with the intent to punish clan members.

We also find remarkable the BIA's overall conclusion that Ali did "not present[ ] evidence of past harm which is necessarily linked to his clan membership and which bolsters the belief he will be tortured in the future." The BIA reached this conclusion only by omitting any mention of the attempted rape and murder of Ali's sister and the violence Ali endured personally. Soldiers from the invading Hawiye clan attempted to rape Ali's sister, then killed her when she resisted. This atrocity took place in the context of the interclan warfare between the dominant Hawiye and the Rayanweyn, and it was carried out in the Ali family home with Ali—who was then sixteen years old—looking on. Ali himself was shot at and beaten by militiamen affiliated with the Hawiye. The BIA also made no mention of the clan-based violence Ali suffered at the

hands of the Darod militia on the Somali-Kenyan border after fleeing from the Hawiye. The record reflects that the violence Ali witnessed and experienced had a profound psychological effect on him, precipitating post-traumatic stress disorder.

By focusing narrowly on the deaths of Ali's two brothers—both of which could plausibly be attributed to the generally unsafe, lawless conditions in Somalia—the BIA sidestepped critical evidence it was required to consider. 8 C.F.R. § 1208.16(c)(3). When all the relevant evidence is properly considered, the record compels the conclusion that Ali would more likely than not face torture if removed to Somalia.[6]

Because the BIA found Ali was not likely to face torture in Somalia, it left open the question whether he would face torture "at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). The parties have not fully briefed this issue on appeal—each only briefly men-

---

[6] Ali's case is not like *Pelinkovic v. Ashcroft*, 366 F.3d 532 (7th Cir. 2004), a case on which the government relies. *Pelinkovic* upheld the denial of a claim for relief under the CAT because the petitioners failed "to make a particularized showing that any of them would more likely than not be subject to torture upon their return, as differentiated from the general risk shared by all ethnic Albanians in Montenegro." We explained it was impossible for the petitioners to show a likelihood of torture because "the events they feared were prospective—*possible* civil war with Serbia, *possibly* resulting in the same ethnic cleansing directed at ethnic Albanians as in other Milosevic campaigns. Thankfully, those possibilities did not come to pass." *Id.* at 542. Here, Ali's fears are not premised on merely prospective possibilities; they are rooted in the reality of Somalian interclan and intraclan warfare that devastated his own family and continues to plague much of his homeland.

tioning the matter—so the prudent course is to remand the case for the BIA to consider whether Ali established the official capacity element of his CAT claim.

### III.  Conclusion

Ali's petition for review is DENIED with respect to his claims for waiver of inadmissibility, asylum, and withholding of removal. His petition is GRANTED as to his claim for deferral of removal under the CAT, and that claim is REMANDED to the BIA for further proceedings consistent with this opinion.

AFFIRMED IN PART AND REVERSED AND
REMANDED IN PART.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*