In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1689

ALEKSEY ARKADYEVICH RUDERMAN,

*Petitioner*,

*v.*

MATTHEW G. WHITAKER,
Acting Attorney General of the United States,

*Respondent*.

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A076-054-163

ARGUED FEBRUARY 20, 2018 — DECIDED JANUARY 29, 2019

Before WOOD, *Chief Judge*, and EASTERBROOK and BARRETT, *Circuit Judges*.

BARRETT, *Circuit Judge*. Aleksey Arkadyevich Ruderman is seeking to avoid removal to Belarus, his native country. An immigration judge ruled that Ruderman was inadmissible under the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(2)(B), and thus subject to removal. The judge also

held that Ruderman was not eligible for a waiver of inadmissibility and adjustment of status, cancellation of removal, asylum, withholding of removal, or protection under the Convention Against Torture. The Board of Immigration Appeals agreed. In particular, it held that Ruderman had not raised any meaningful challenge to his inadmissibility determination and that even if the immigration judge had applied the wrong legal standard to determine that Ruderman was ineligible for a waiver of inadmissibility, her alternative discretionary denial made the error harmless.

Ruderman petitions us for review of those holdings, along with others reached by the immigration judge and affirmed by the Board. While we largely agree with the Board's analysis, we hold that it was flawed with respect to one issue: the question whether Ruderman is statutorily inadmissible. We therefore grant Ruderman's petition and remand for the Board to revisit that question and, if necessary, to decide whether Ruderman is eligible for a waiver.

I.

Ruderman moved to the United States when he was nineteen to escape discrimination and violence directed at him on account of his Jewish heritage. He moved from his native land of Belarus, a former Soviet republic that declared independence during his childhood. In Belarus, Ruderman and his family were targeted for abuse by Neo-Nazis and pro-Russia advocates who would shout profanities at them, perform the Nazi salute, leave anti-Jewish propaganda in their mailbox, and throw bottles and stones at their home.

Ruderman received even worse treatment at school. His (sometimes much older) classmates would bully and beat him

and the handful of other Jewish students. The head of the school and the police were alerted but did nothing to address the situation. One particularly severe attack resulted in stitches and a permanent scar, while another resulted in two broken wrists that have bothered him ever since.

After attackers broke Ruderman's wrists, his parents sent him to a private school where he would be safer. His time there was cut short, however, by his father's death. Arkady Ruderman, a documentary filmmaker, died while filming a piece on government corruption in Tajikistan—another former Soviet republic. Although government officials reported that he was killed in a car accident, Arkady had previously been detained and battered by the KGB, and eyewitnesses said that they saw bullet holes in his dead body. Those reports could not be confirmed because the police ordered that Arkady's casket remain closed at his funeral—and then attended the event to make sure that it did.

Without Arkady's income, Ruderman's family could no longer afford his private school tuition, so Ruderman enrolled at a different public school where he was subjected to familiar anti-Semitic verbal abuse. He became so afraid that in the ninth grade he stopped attending classes entirely and later transferred to a technical school. There, in spite of continued verbal abuse, he performed well and graduated with high grades. Once out of school, however, he found that his Jewish heritage made it difficult for him to get a job.

Fed up with the abuse and intolerance, Ruderman fled to the United States in 2001 under a provision known as the Lautenberg Amendment, which lowers barriers to immigration for certain former soviet nationals. *See* Pub. L. No. 101-167, tit. V, §§ 599D–E, 103 Stat. 1195, 1261–64 (1989) (codified

as amended at 8 U.S.C. § 1157 note, § 1255 note). His life in America got off to a rocky start; shortly after arriving he was convicted of driving under the influence of alcohol and sentenced to court supervision. But over the next several years, he found work as a cab driver and a security officer, met his future wife Elena, and moved into an apartment with her and her two children in Milwaukee.

In 2008, Ruderman struck and killed a pedestrian with his vehicle while driving drunk. He accepted responsibility, pleaded guilty to homicide by negligent operation of a vehicle, and was convicted and sentenced to five years in prison. Following his release in 2013, he worked at a transportation company—until U.S. Customs and Immigration Services denied his adjustment-of-status application, causing his work permit to expire.

In January of 2016, the government detained Ruderman and began removal proceedings. The immigration judge ultimately concluded that Ruderman was statutorily inadmissible because of his two convictions. The judge also denied Ruderman's applications for a waiver of inadmissibility, adjustment of status under the Lautenberg Amendment, cancellation of removal, asylum, withholding of removal, and protection under the Convention Against Torture.

Ruderman appealed the immigration judge's decision in an extensive pro se brief and later in a second brief filed by pro bono counsel. The counseled brief supplemented certain arguments that Ruderman had made in his initial brief but conceded others. Significantly, the later brief conceded that "[Ruderman's] convictions for two crimes with an aggregate prison sentence of five years make him 'inadmissible.'" That concession contradicted Ruderman's pro se argument that the

inadmissibility statute applies only when two or more convictions each result in a sentence to confinement, and so Ruderman's sole sentence to confinement—which imposed five years in prison—did not make him inadmissible.

The Board dismissed Ruderman's appeal. First, it noted in passing that Ruderman "ha[d] not raised any meaningful challenges" to his inadmissibility, and thus the issue was "waived." Second, the Board adopted and affirmed the immigration judge's denial of Ruderman's applications for cancellation of removal, withholding of removal, and protection under the Convention Against Torture. Finally, the Board affirmed the denial of Ruderman's request for a waiver of inadmissibility and adjustment of status under the Lautenberg Amendment. The Board bypassed Ruderman's argument that the immigration judge had applied the wrong standard to determine whether Ruderman was eligible for a waiver of inadmissibility and instead affirmed the judge's conclusion that, even if Ruderman were eligible to be considered for a waiver, she would exercise her discretion to deny him relief.

## II.

Ruderman petitions us for review of the Board's decision. He takes issue with the Board's conclusion that he waived his opportunity to challenge his inadmissibility, and he argues that the application of the wrong standard for determining his eligibility for a waiver of inadmissibility contaminated the immigration judge's discretionary denial of a waiver. He also claims that the judge erred by holding—and the Board erred by affirming—both that his negligent homicide was "particularly serious" and that he failed to show a "substantial risk" that he would be tortured in Belarus.

Because the Board provided its own analysis and also af-firmed the immigration judge's decision, we review both de-cisions. *Sobaleva v. Holder*, 760 F.3d 592, 596 (7th Cir. 2014).

A.

Ruderman argued in his pro se brief that he is not inad-missible under § 212(a)(2)(B) of the Immigration and Nation-ality Act, 8 U.S.C. § 1182(a)(2)(B), because he has only ever re-ceived one sentence to confinement. The Act states that an im-migrant is inadmissible to receive a visa or to be admitted to the United States if he is convicted of "2 or more of-fenses … for which the aggregate sentences to confinement were 5 years or more." *Id.* Ruderman interprets "sentences to confinement" to require more than one custodial sentence. He supports this reading by pointing to the word "aggregate," which he argues would be superfluous if the statute could be satisfied by a single sentence to confinement. *Id.* Because his first conviction—for driving under the influence—did not re-sult in confinement, he concludes that he is not inadmissible. His pro bono counsel, however, conceded Ruderman's inad-missibility in a later-filed brief.

The Board did not address Ruderman's inadmissibility ar-gument, instead concluding that he had failed to raise any meaningful challenges to his inadmissibility and so had waived the issue. It appears likely that the Board reached that conclusion on the basis of Ruderman's counsel's concession, because Ruderman did raise the argument in several places—including his notice of appeal and pro se brief, both of which remained on the record. But the Board's opinion did not oth-erwise indicate whether the counseled brief superseded the pro se brief.

A later-in-time concession waives an issue in federal court—but we do not know whether that is true before the Board as well. On this record it is unclear why the Board concluded that Ruderman waived his challenge, and the Board's failure to explain inhibits our review of the issue. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."). We grant Ruderman's petition and remand this issue to the Board to clarify why it did not address Ruderman's inadmissibility argument.

B.

If on remand the Board confirms that Ruderman is inadmissible, his application for a waiver of inadmissibility should be reviewed under the correct legal standard. The immigration judge concluded that Ruderman was statutorily ineligible for a waiver because he did not show that his removal would cause "extreme hardship" to his U.S.-citizen wife. 8 U.S.C. § 1182(h)(1)(B). When a waiver is sought in conjunction with an application for a status adjustment under the Lautenberg Amendment, however, there is no threshold eligibility requirement; a waiver may be granted simply "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." 8 U.S.C. 1255 note; *see also* 8 C.F.R. § 1245.7(d). The immigration judge erred by not considering Ruderman's application under this less stringent standard.

The Board concluded that this error was harmless because the immigration judge held in the alternative that she would exercise her discretion to deny Ruderman relief if he were eligible to be considered for it. The assumption seems to be that the judge would have made the same discretionary denial of a waiver under the Lautenberg Amendment as she made under § 1182(h). But, as we have already noted, the former provides discretion to grant a waiver for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest; the latter entails a potentially more complex consideration of the ground for exclusion at issue, past immigration violations or criminal history, evidence of rehabilitation, general evidence of good or bad character, strength of family ties, duration of residence in the United States, and evidence of value to the community. *See In re Mendez-Moralez*, 21 I. & N. Dec. 296, 301 (BIA 1996). Because these statutes, along with the cases and regulations interpreting them, articulate distinct factors to be considered in deciding whether to grant a discretionary waiver of inadmissibility, the Board cannot simply substitute one standard for another and assume that the outcome would be the same. If the Board confirms Ruderman's inadmissibility on remand, it should consider his application for a waiver under the proper framework.

## C.

Ruderman's other arguments go nowhere. First, he claims that he is eligible for asylum and withholding of removal because he did not commit a "particularly serious crime." 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii). Ruderman committed homicide by negligent operation of a vehicle, Wis. Stat. § 940.10(1); he argues that Congress did not intend for crimi-

nal negligence like his to qualify as particularly serious. Generally, classification of a crime as "particularly serious" is within the discretion of the Attorney General—exercised here by the Board. *Petrov v. Gonzales*, 464 F.3d 800, 802 (7th Cir. 2006). Our review of these classifications is confined to constitutional and legal questions. 8 U.S.C. § 1252(a)(2); s*ee also Estrada-Martinez v. Lynch*, 809 F.3d 886, 892 (7th Cir. 2015). And when those legal questions implicate ambiguous statutory provisions, we give deference. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–44 (1984).

We considered the meaning of "particularly serious crime" in some depth in *Ali v. Achim*, 468 F.3d 462 (7th Cir. 2006). In that case, the petitioner argued that the Board could not hold that his conviction for "substantial battery with a dangerous weapon," a nonaggravated felony, was a particularly serious crime under § 1158(b)(2) and § 1231(b)(3) because it did not fall within the two categories of crimes identified as per se "particularly serious" in § 1158(b)(2): aggravated felonies and other crimes that the Attorney General designates by regulation. *Id.* at 468–69. We disagreed, explaining that the presence of these categories does not cabin the Board's discretion to determine that nonaggravated felonies are particularly serious on a case-by-case basis. *Id.* at 469. In the same way, the Board is not precluded from determining that some crimes of negligence are particularly serious.

Nor does the Immigration and Nationality Act's separate definition of "serious criminal offense" undermine the Board's interpretation. The Act identifies "driving while intoxicated or under the influence of alcohol" as a serious criminal offense if it "involves personal injury to another." 8 U.S.C. § 1101(h)(3). Ruderman argues that "*particularly* serious

crime" must be interpreted to require more. Maybe so. But even if he's right, criminally negligent homicide entails more than mere "personal injury," so the argument is a dead end.

Finally, even if § 1158(b)(2)(A)(ii) and § 1231(b)(3)(B)(ii) were ambiguous as to whether crimes of negligence could be "particularly serious," Ruderman has not shown that the Board's interpretation is too unreasonable to merit deference under *Chevron*. *See Ali*, 468 F.3d at 470. Nor has he shown that the Board's interpretation is so likely to conflict with the Constitution or international law that we need to consider whether some other interpretation is warranted.

## D.

Finally, Ruderman contends that the Board should have granted him protection under the Convention Against Torture, 8 C.F.R. §§ 1208.16–18. The Convention forbids the return of "a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3(1), Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1990), 1465 U.N.T.S. 85. Federal regulations define torture as requiring "the consent or acquiescence of a public official." 8 C.F.R § 1208.18(a)(1). Immigration judges must withhold or defer removal if an applicant demonstrates that "it is more likely than not that he or she would be tortured if removed." 8 C.F.R. § 1208.16(c)(2). We have explained that "more likely than not" means that there is a "substantial risk" that the alien will be tortured. *Rodriguez-Molinero v. Lynch*, 808 F.3d 1134, 1135–36 (7th Cir. 2015); *see also Perez-Montes v. Sessions*, 880 F.3d 849, 850 (7th Cir. 2018).

Ruderman argues that the immigration judge both misunderstood and misapplied the "substantial risk" standard. But there is no evidence of the former; the immigration judge cited our decision in *Rodriguez-Molinero* and proceeded to analyze whether there was a substantial risk that Ruderman would be subject to torture inflicted by or with the consent of a public official if he returned to Belarus. *See* 8 C.F.R. § 1208.18(a)(1)–(2). And Ruderman fails to establish the latter. We review the Board's conclusion that there was no substantial risk of torture under the "highly deferential substantial evidence test," which mandates denying the petition unless "the record evidence *compels* a contrary conclusion." *Lopez v. Lynch*, 810 F.3d 484, 492 (7th Cir. 2016) (citation omitted).

The record evidence does not compel a contrary conclusion. To be sure, certain findings from the immigration judge give us pause. For one, the judge concluded that there was no substantial risk of torture for Jews in Belarus because, despite "widespread anti-Semitism in Belarus," incidents targeting Jews have been declining. While it is true that the raw number of anti-Jewish incidents in Belarus has declined, so has the Jewish population. In this context, an absolute decrease in incidents does not necessary equate to a relative increase in safety for any individual. Nor does the evidence of Ruderman's mother's safe travel to and from Belarus mean that Ruderman will be equally safe. His mother has a Christian name that is not associated with her late husband, whereas Ruderman's patronymic clearly signals that he is both Jewish and the son of a known political activist whom the KGB may have tortured and killed. But on the other hand, there is evidence that Ruderman became less susceptible to physical attacks as he grew and became better able to defend himself, that no one in his family has been threatened in Belarus, and

that he lived in Belarus for eight years following his father's death without any threat of torture on account of his relationship to his father. Considering all the evidence, the record does not compel the conclusion that there is a substantial risk that Ruderman would be tortured if he returned to Belarus.

* * *

Ruderman's petition for review is GRANTED.