[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-14197
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 22, 2012
JOHN LEY
CLERK

Agency No. A078-804-916

GAI MAKIR-MARWIL,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(May 22, 2012)

Before HULL and COX,  Circuit Judges, and WALTER,* District Judge.

_____

* The Honorable Donald E. Walter, United States District Judge for the Western District
of Louisiana, sitting by designation.

HULL, Circuit Judge:

Gai Makir-Marwil, a native and citizen of Sudan, petitions for review of the Board of Immigration Appeals' ("BIA") final order affirming the Immigration Judge's ("IJ") order of removal and denial of Makir-Marwil's application for a waiver of inadmissibility under § 209(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1159(c). After review and oral argument, we grant the petition in part, deny the petition in part, and remand for further proceedings as to Makir-Marwil's application for a § 209(c) waiver of inadmissibility.

## I. BACKGROUND

### A. Notice to Appear

In 2000, Makir-Marwil, age 12, was admitted to the United States as a refugee from Sudan. In 2004, Makir-Marwil applied to adjust his status to lawful permanent resident, but on October 18, 2005, this application was denied because Makir-Marwil failed to appear for an interview.

In 2006, at age 18, Makir-Marwil pled nolo contendere to charges of grand theft of a go-cart and burglary of a dwelling, in violation of Florida Statutes §§ 812.014 and 810.02(4), respectively. He was sentenced to 31 months' imprisonment for these 2006 offenses.

In 2007, the Department of Homeland Security ("DHS") issued a notice to appear ("NTA"), charging that Makir-Marwil was removable on account of his

2

2006 convictions.  See INA § 237(a)(2)(A)(i) to (iii), 8 U.S.C. § 1227(a)(2)(A)(i) to (iii).  At a January 8, 2008 master calendar hearing, Makir-Marwil admitted the factual allegations in the NTA and conceded removability.  At that hearing, the IJ found Makir-Marwil removable.

## B. Makir-Marwil's Applications for Relief

On May 14, 2008, Makir-Marwil applied to the DHS for a waiver of inadmissibility.  On September 14, 2008, he applied for asylum, withholding of removal, and temporary deferral of removal pursuant to the United Nations Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.17.

As explained later, the IJ granted temporary deferral of removal under CAT but denied Makir-Marwil's application for asylum and withholding of removal. This appeal does not involve those issues.  Instead, this appeal concerns the IJ's denial of Makir-Marwil's application for a § 209(c) waiver of inadmissibility, which is needed for him to adjust his status to lawful permanent resident.

## C. General Principles for a § 209(c) Waiver of Inadmissibility

Generally, an alien—like Makir-Marwil—who commits a "crime of moral turpitude" is inadmissible and therefore may not have his status adjusted to that of a lawful permanent resident.  See INA §§ 212(a)(2)(A)(i)(I), 209(b)(5), 8 U.S.C. §§ 1182(a)(2)(A)(i)(I), 1159(b)(5).  However, under § 209(c) of the INA, the

3

Attorney General has discretion to waive a refugee's inadmissibility "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." INA § 209(c), 8 U.S.C. § 1159(c). Such a waiver of inadmissibility restores a refugee's eligibility to receive lawful permanent residency. See INA § 209(a)–(b), 8 U.S.C. § 1159(a)–(b).

The Attorney General has established guidelines for exercising his discretion whether to grant a § 209(c) waiver of inadmissibility to a refugee convicted of a crime involving moral turpitude. In re Jean, 23 I. & N. Dec. 373 (A.G. 2002) (reversing the BIA's grant of a § 209(c) waiver of inadmissibility to a woman convicted of second-degree manslaughter). In Jean, the Attorney General explained that the evaluation of a § 209(c) waiver application cannot focus solely on family hardship, "but must consider the nature of the criminal offense that rendered an alien inadmissible in the first place." Id. at 383. These considerations counsel against granting a waiver to a refugee convicted of a serious criminal offense. Id. Nevertheless, the Attorney General's guidelines in Jean provide that, even if a refugee is convicted of a serious offense and determined to be a "violent or dangerous individual[]," a § 209(c) waiver may still be granted. Id. In such cases, however, the refugee must identify "extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of status adjustment would

4

result in exceptional and extremely unusual hardship." Id. (emphasis added).

In sum, in § 209(c) waiver cases, the first step is to determine if the refugee is a "violent or dangerous individual." If the refugee is not "violent or dangerous," the general statutory standard for a § 209(c) waiver applies, and the refugee must show that the waiver would serve humanitarian purposes, would assure family unity, or otherwise would be in the public interest. See INA § 209(c), 8 U.S.C. § 1159(c). But a refugee who is "violent or dangerous" must satisfy both the statutory standard and the heightened, "extraordinary circumstances" standard outlined in Jean. To show extraordinary circumstances, the refugee can establish that national security or foreign policy considerations warrant the waiver or that denial of the waiver would result in "exceptional and extremely unusual hardship" to the refugee.

**D. DHS Denial of Waiver of Inadmissibility**

Here, Makir-Marwil applied for a waiver of inadmissibility on all three grounds listed in § 209(c): for humanitarian reasons, to assure family unity, and because a waiver would be in the public interest. In an addendum to his application, Makir-Marwil stated that in Sudan he endured "conflict and genocide from a very young age." He claimed that when he was attending school in Khartoum, an uncle warned his family that the Muslim militia intended to recruit Makir-Marwil as a child soldier. His family decided to flee Sudan, but before they

could escape, his father disappeared, never to be heard from again. Makir-Marwil also noted that his mother, step-father, and grandmother are legal permanent residents and that his step-father joined the U.S. Army in 2008. Makir-Marwil stated that his step-father has been away since joining the Army and has been separated from his daughters, Makir-Marwil's sisters. Makir-Marwil stated that he had planned to join the U.S. Army before his "legal troubles began." Additionally, Makir-Marwil noted that the "conflict and genocide in Sudan is ongoing. There is a severe humanitarian crisis in Sudan and the violence is immense."

The record contains the State Department's 2007 Country Report on Sudan.[1] The Country Report states that the government, government-aligned militias, and tribal factions "razed numerous villages, committed acts of torture, and perpetrated violence against women." The Country Report also indicates that the Sudanese government's "human rights record remained poor" and identifies serious abuses, including: "extrajudicial and other unlawful killings by government forces and other government-aligned groups"; "torture, beatings, rape, and other cruel, inhumane treatment or punishment by security forces"; "arbitrary arrest and detention, including incommunicado detention of suspected government opponents"; and "forced military conscription of underage men." In addition, the

---

[1]The State Department's 2007 Country Report is an attachment to Makir-Marwil's application for asylum and withholding of removal.

government "continued to place restrictions on non-Muslims, non-Arab Muslims, and Muslims from tribes or sects not affiliated with the ruling party." The Country Report notes that the ruling party "originally came to power with a goal of Islamization, treated Islam as the state religion," and "restricted Christian activities."

On September 19, 2008, the DHS denied Makir-Marwil's application for a discretionary waiver of inadmissability.

## E. IJ Hearing and Decision

At a January 2009 hearing, the IJ considered Makir-Marwil's waiver application de novo and considered Makir-Marwil's request for asylum, withholding of removal, and temporary deferral of removal under CAT. Makir-Marwil and his mother, Awaud Akanju, testified at the hearing. In a written decision, the IJ denied Makir-Marwil's application for asylum, withholding of removal, and a waiver of inadmissibility but, as noted earlier, granted a temporary deferral of removal under CAT.[2]

As to Makir-Marwil's criminal convictions, the IJ found that Makir-Marwil

---

[2]In denying Makir-Marwil's application for asylum and withholding of removal, the IJ concluded that Makir-Marwil's 2006 burglary conviction was an "aggravated felony" punishable by a term of at least one year's imprisonment and therefore was a "particularly serious crime" rendering Makir-Marwil ineligible for asylum. See INA § 101(a)(43)(G), 8 U.S.C. § 1101(a)(43)(G); INA § 208(b)(2)(B)(ii), 8 U.S.C. § 1158(b)(2)(B)(ii). Makir-Marwil's 2006 burglary also disqualified him from withholding of removal or permanent CAT relief. See INA § 243(b)(3)(B)(ii), 8 U.S.C. § 1231(b)(3)(B)(ii); 8 C.F.R. § 1208.16(d)(2). Makir-Marwil does not appeal these findings.

was in trouble with the law beginning at age 15. In 2005, Makir-Marwil pled nolo contendere to charges of burglary of a vehicle and strong-arm robbery, in violation of Florida Statutes §§ 810.02(4)(b) and 812.13(2)(c), respectively. He was sentenced as a youthful offender to terms of 18 months' probation for each offense. The IJ found that Makir-Marwil's 2005 robbery conviction resulted from an incident in which one of his friends snatched an elderly woman's purse. Makir-Marwil yelled at his friend to stop. Makir-Marwil then fled to a house where he was later arrested. As to his 2005 burglary conviction, Makir-Marwil was arrested after a person in his neighborhood reported that his car had been stolen. Makir-Marwil admitted taking the car, but explained that he "thought it was all right" because the car's owner knew him. These 2005 convictions were not listed in the NTA, but Makir-Marwil does not dispute their validity.

As to Makir-Marwil's 2006 convictions identified in the NTA, the IJ found that the 2006 burglary conviction involved a residence where a man and a woman lived. Makir-Marwil stated that the male occupant of the residence broke through a window and invited him in through the front door. The man told him that the woman was not returning and that Makir-Marwil could take whatever he wanted. Makir-Marwil admitted taking a televison, a computer, and a radio. As to his 2006 grand theft conviction, the IJ found that Makir-Marwil and his friends had taken a go-cart from another person's house and that he did not know the go-cart owner.

8

As to Makir-Marwil's application for waiver of inadmissibility, the IJ found that he was a "violent and dangerous individual" subject to Jean's heightened standard for obtaining a waiver of inadmissibility. See Jean, 23 I. & N. Dec. at 383. Noting that Makir-Marwil "must waive not one, but four serious convictions," the IJ concluded that Makir-Marwil's crimes "include distressing underlying facts that classify him as a dangerous individual."

Specifically, the IJ found "particularly troubling" Makir-Marwil's 2006 burglary of a residential dwelling, due to the "heightened risk of violence in such crimes." The IJ also noted that Makir-Marwil admitted to purchasing crack-cocaine with the proceeds of the 2006 burglary. As to the 2005 robbery, the IJ noted that strong-arm robbery was a "crime of violence" and found that the conviction revealed "an exploitative nature because [Makir-Marwil] targeted a vulnerable person, an elderly lady, for a purse snatching." Although Makir-Marwil was convicted as an accomplice, the IJ found that this fact did not mitigate the seriousness of the offense. The IJ also noted that Makir-Marwil "was treated as a juvenile delinquent and youthful offender [after his 2005 offenses], but he did not stop his errant behavior until he was incarcerated in 2006."

Applying Jean's heightened standard for "violent and dangerous individuals," the IJ found that Makir-Marwil failed to establish extraordinary circumstances warranting a waiver of inadmissibility. The IJ found that Makir-

9

Marwil and his family "would experience some hardship" upon his removal but concluded that "such hardship would [not] amount to exceptional and extremely unusual hardship." As to disruption to his family, the IJ was not persuaded that Makir-Marwil was an integral part of his family in the United States (his mother, grandmother, and two U.S. citizen sisters).

For purposes of this appeal, the critical part of the IJ's decision is this next paragraph because it is the IJ's only discussion of the conditions in Sudan as they pertain to Makir-Marwil's application for a waiver of inadmissibility and whether he has shown "extraordinary circumstances" under Jean. In this regard, the IJ states:

> The Court is also unconvinced that the political considerations present in this case demand favorable discretion. The Court reviewed all submitted documents and recognizes Sudan's poor human rights record as well as the United States position on the Sudanese government. However, the Court fails to see how his case would reverberate beyond those directly impacted by [Makir-Marwil's] removal. The Court finds, instead, that these issues are better analyzed and considered on alternate forms of relief, particularly relief under Article 3 of the Convention Against Torture.

We consider this paragraph in the context of Jean's requirement that a "violent or dangerous individual" must show "extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of status adjustment would result in exceptional and extremely unusual hardship." Jean, 23 I. & N. Dec. at 383.

10

Although this paragraph lacks clarity, the most reasonable reading is that the IJ concludes that the conditions in Sudan are better analyzed and considered in response to Makir-Marwil's CAT claim and not as to whether Makir-Marwil has established "exceptional and extremely unusual hardship" for purposes of a waiver of inadmissibility. At best, this statement by the IJ addresses only the political or foreign policy considerations affected by this case. But <u>Jean</u> also identifies "exceptional and extremely unusual hardship" to the individual as a separate extraordinary circumstance (apart from foreign policy considerations) that may warrant relief in an appropriate case. In denying Makir-Marwil's application for a waiver of inadmissibility, the IJ did not consider any individual hardship to Makir-Marwil resulting from the country conditions in Sudan, such as the abject poverty, war, genocide, and forced military service, as well as the severe humanitarian crisis in Sudan.

The IJ, however, granted Makir-Marwil's request for a deferral of removal pursuant to CAT. The IJ observed that "Sudan's human rights violations and propensity to engage in state sponsored torture is well documented. In addition, [Makir-Marwil's] age, ethnicity, religion, and family background places him in a high probability zone to be targeted for maltreatment by the Sudanese authorities." The IJ examined evidence in the administrative record and concluded that "torture . . . is routinely practiced in Sudan, with specific intent, and with direct

11

involvement of the government," and that the practice of torture in Sudan was "pervasive." The IJ noted that Makir-Marwil "will be singled out for detention and interrogation because of his age" and is "liable for national military service in Sudan." The IJ found that "it [is] a certainty that [Makir-Marwil] will be required to endure some sort of interrogation by the Sudanese authorities" and that he "is uniquely exposed to . . . high danger of torture."

The IJ found that the following facts met the burden of proof on Makir-Marwil's CAT claim: (1) Makir-Marwil is "not Arab" but "of southern African descent with a dark complexion," which would subject him to increased scrutiny; (2) Makir-Marwil and his family are "Christians," "the government of Sudan engages in forced Islamization of non-Muslims," and Makir-Marwil "would face intense pressure from the Sudanese authorities to convert to Islam, much as [Makir-Marwil's] two uncles had been"; and (3) Makir-Marwil's father "was involved in politics, . . . had been arrested three times by the Sudanese authorities, . . . disappeared as the family was leaving Sudan," and—according to Makir-Marwil's mother—might "still be detained in jail."

In light of this record evidence, the IJ found that, if Makir-Marwil were removed to Sudan, "there is a high likelihood that he would be further targeted by the Sudanese authorities because of his family background and his father's involvement in politics." Accordingly, the IJ granted Makir-Marwil's application

12

for deferral of removal under CAT.  See 8 C.F.R. § 1208.16(c)(2).

## F.  Appeal to the BIA

Makir-Marwil appealed to the BIA, challenging the denial of his application for a waiver of inadmissibility.  In pertinent part, Makir-Marwil argued that (1) the IJ erred by employing a "categorical" approach, rather than a "fact-based" analysis, of Makir-Marwil's criminal convictions in determining that he was a "violent and dangerous" individual subject to Jean's heightened standard; and (2) even if Jean's heightened standard applied, the IJ erred in finding that Makir-Marwil had not established "exceptional and extremely unusual hardship" to him as an individual and especially in not analyzing and addressing the conditions in Sudan as part of his hardship if returned there.

Makir-Marwil stated this in several ways, such as by noting that the IJ "properly found [Makir-Marwil] would be tortured if returned to Sudan" but failed to address "the fact that torture of Mr. Makir-Marwil would rise to the level of exceptional and extremely unusual hardship, which it surely does."  Later in his brief, Makir-Marwil asserted that the IJ "failed to properly analyze the exceptional and extremely unusual hardship that Mr. Makir-Marwil would suffer himself."  Importantly, Makir-Marwil's brief to the BIA argued that both "the torture of Mr. Makir-Marwil and the horrific country conditions in Sudan not only allow[] for a favorable exercise of discretion [but] compel[] a favorable exercise of discretion"

13

in granting a waiver. His brief argued that "[t]he record and testimony demonstrate the torture, abject poverty, war, genocide, and persecution that Mr. Makir-Marwil would face if returned to Sudan."

In a two-to-one panel decision, the BIA rejected both of Makir-Marwil's assertions of error. First, the BIA majority concluded that the Attorney General's decision in Jean did not require the IJ to use a "fact-based" analysis in determining whether an alien is "violent or dangerous." The BIA found "no error in the [IJ's] determination that [Makir-Marwil's] convictions for two separate counts of burglary (one count of which involved a residential dwelling), grand theft, and robbery, demonstrate that he 'is a violent and dangerous individual' based on the analysis set forth in [the IJ's] well-reasoned decision."

Second, the BIA majority rejected Makir-Marwil's challenge to the IJ's "hardship" analysis. The BIA stated "the only factor that [Makir-Marwil] asserts that the Immigration Judge erred in failing to consider is the fact that it is more likely than not that he will be tortured upon return to Sudan." However, as shown above, Makir-Marwil's brief to the BIA actually mentions other country conditions—such as the "abject poverty," "war," and "genocide" in Sudan, and the "persecution" that he would face if returned to Sudan—that do not rise to the level of torture but might nevertheless create "exceptional and extremely unusual hardship" to Makir-Marwil.

14

As to torture only, the BIA concluded that the IJ "did not err when he did not address whether [Makir-Marwil] would be harmed upon return to Sudan." The reason the BIA saw was that Makir-Marwil "will not face any 'exceptional and extremely unusual hardship' because he is not being removed to Sudan." The BIA added that "there is no basis in reality upon which to conclude that [Makir-Marwil] will be tortured in Sudan because he is not being removed to Sudan. Our legal analysis must be based on actual hardship, not hypothetical hardship." Accordingly, the BIA dismissed Makir-Marwil's appeal.

The BIA dissent disagreed on both issues. The dissent argued that <u>Jean</u> required the IJ to employ a "fact-based" analysis to determine whether an alien is violent or dangerous and concluded that the IJ's analysis was "categorical" and therefore insufficient under <u>Jean</u>. On the issue of the IJ's hardship analysis, the dissent argued that the temporary deferral of removal under CAT did not excuse the IJ's duty to consider evidence of Makir-Marwil's potential torture in Sudan in deciding whether to waive his inadmissibility. The dissent concluded that "humanitarian consideration[s]" counseled in favor of waiving Makir-Marwil's inadmissibility and adjusting his status to lawful permanent resident.

Makir-Marwil timely petitioned this Court for review.

## II. DISCUSSION[3]

Makir-Marwil's petition raises two issues. First, he argues that the BIA erred by concluding that <u>Jean</u> does not require a "fact-based" analysis of Makir-Marwil's prior convictions to determine whether he was a "violent or dangerous individual." Second, Makir-Marwil argues that the BIA erred in refusing to consider the conditions in Sudan and evidence of the individual hardship Makir-Marwil would suffer if removed to Sudan.[4] We address each argument in turn.

## A. "Categorical" or "Fact-Based" Analysis Under <u>Jean</u>

Applying <u>Jean</u>, the IJ found that Makir-Marwil was a "violent or dangerous individual" and thus could be granted a waiver only upon a showing of "extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of status adjustment would result in exceptional and extremely unusual hardship." Makir-Marwil argues that <u>Jean</u> required the IJ to apply a "fact-based"

---

[3]We review questions of law <u>de novo</u>. <u>De Sandoval v. U.S. Att'y Gen.</u>, 440 F.3d 1276, 1278 (11th Cir. 2006). We review the BIA's decision and the IJ's decision "[i]nsofar as the BIA adopts the IJ's reasoning." <u>Chen v. U.S. Att'y Gen.</u>, 463 F.3d 1228, 1230 (11th Cir. 2006). Here, the BIA expressly agreed with the IJ's analysis of Makir-Marwil's convictions. Therefore, we review both the IJ's and the BIA's decisions.

[4]This Court lacks jurisdiction to review a discretionary decision of the Attorney General, including the discretionary denial of an application for a waiver of inadmissibility. <u>See</u> INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii). However, challenges to the IJ's and BIA's legal standards, such as the challenges here, are questions of law over which this Court has jurisdiction. <u>See</u> INA § 242(a)(2)(D), 8 U.S.C. § 1252(a)(2)(D).

16

approach and to look to the underlying circumstances of his crimes, and that the IJ failed to do so in determining that he was a "violent or dangerous individual." Because this argument turns so heavily on the actual language the Attorney General used in Jean, we review the Attorney General's opinion in more detail.

In Jean, removal proceedings were commenced against Melanie Beaucejour Jean, a Haitian refugee, after she finished serving a prison sentence for second-degree manslaughter.  23 I. & N. Dec. at 374–75.  Jean had confessed to shaking and beating a toddler she was babysitting; the toddler died after Jean failed to call 911 or seek help.  Id. at 374–75.  Jean's conviction rendered her inadmissible as an alien convicted of a crime of moral turpitude.  See  INA §§ 212(a)(2)(A)(i)(I), 240(a), 8 U.S.C. §§ 1182(a)(2)(A)(i)(I), 1229a(a) (including in "classes of aliens ineligible for . . . admission" aliens convicted of "a crime involving moral turpitude").

Like Makir-Marwil, Jean did not contest her inadmissibility.  Jean, 23 I. & N. Dec. at 375–76.  Rather, Jean applied for a waiver of inadmissibility under INA § 209(c), which, as described above, permits the Attorney General to waive an alien's inadmissibility "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest."  Jean cited her fear of persecution in Haiti and her desire to keep her family together as grounds for the waiver.   The IJ declined to waive Jean's inadmissibility, but the BIA reversed in a short opinion,

17

concluding that Jean had established grounds to waive her inadmissibility because "the equities" warranted such discretionary relief.  Id. at 383.

Reversing the BIA, the Attorney General stated that the BIA's analysis was "grossly deficient" because the BIA made "no attempt to balance claims of hardship to [Jean's] family against the gravity of her criminal offense."  Id.  The Attorney General stated that the BIA "marginalize[d] the depravity" of Jean's crime and failed to attach any significance to the fact that Jean "confessed to beating and shaking a nineteen-month-old child to death."  Id.  Although acknowledging that Jean's removal "will undoubtedly impose a strain on her family" and "will be a source of additional hardship for them," the Attorney General explained that the propriety of granting a § 209(c) waiver requires consideration of both the potential "family hardships" and "the nature of the criminal offense that rendered an alien inadmissible in the first place."  Id. Balancing these considerations in Jean's case, the Attorney General continued:

> In my judgment, that balance will nearly always require the denial of a request for discretionary relief from removal where an alien's criminal conduct is as serious as that of the respondent. . . .  It would not be a prudent exercise of the discretion afforded to me by [§ 209(c)] to grant favorable adjustments of status to violent or dangerous individuals except in extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of status adjustment would result in exceptional and extremely unusual hardship.  Moreover, depending on the gravity of the alien's underlying criminal offense, such a showing might still be

18

insufficient. . . . For those aliens, like [Jean], who engage in violent criminal acts during their stay here, this country will not offer its embrace.

Id. at 383–84. Accordingly, the Attorney General denied Jean's application for a waiver of inadmissibility.

Notably, the Attorney General in Jean required neither a "categorical" nor a "fact-based" approach to determining whether a refugee's conviction renders him a "violent or dangerous individual." See id. While Jean discusses the facts surrounding the particular conviction in that case, there is no holding or requirement in Jean that mandates a "fact-based" or "categorical" approach. Rather, all Jean requires is an adequate consideration of the nature of the refugee's crime. Some crimes may be so serious and depraved that the IJ need only consider the elements of the offense to determine that the alien is violent or dangerous. Sometimes the IJ may delve into the facts and circumstances of the prior offenses to determine whether the alien is violent or dangerous. The IJ need only make an appropriate determination under the circumstances as to whether the alien is violent or dangerous.

In this case, the IJ adequately considered the nature of Makir-Marwil's crimes. For example, the IJ noted that Makir-Marwil (1) had to waive not one but four serious criminal convictions, (2) showed an exploitative nature by preying on an elderly lady who was a particularly vulnerable victim, and (3) burglarized a

residential dwelling, a crime that creates a "heightened risk of violence." The IJ and the BIA committed no error in determining that Makir-Marwil is a violent or dangerous individual subject to <u>Jean</u>'s heightened, "extraordinary circumstances" standard for determining whether to grant a discretionary § 209(c) waiver of inadmissibility.

**B. Refusal to Consider Hardship in Denying Waiver of Inadmissibility**

Makir-Marwil next argues that the IJ and the BIA erred by failing to consider evidence of the country conditions in Sudan and the hardship Makir-Marwil individually would suffer upon removal to Sudan. We agree.

As Makir-Marwil notes, an alien must raise all defenses to removal and grounds for relief from removal in a single proceeding. <u>See</u> 8 C.F.R. § 1003.31(a) & (c). If an application for relief is not filed by the deadline set by the IJ, that ground for relief is deemed waived. Makir-Marwil was thus required to apply for a waiver of inadmissibility at the same time as he applied for CAT relief. And if his CAT deferral is eventually terminated, Makir-Marwil will not be able to reapply for a waiver of inadmissibility.

Although the deferral of removal under CAT resolves the torture issue, the Attorney General may grant a waiver of inadmissibility for reasons other than the possibility of torture, including "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." INA § 209(c), 8 U.S.C. § 1159(c).

20

Even if the refugee-applicant is violent—and thus subject to <u>Jean</u>'s heightened standard—the IJ retains discretion to waive inadmissibility if "an alien clearly demonstrates that the denial of status adjustment would result in exceptional and extremely unusual hardship." <u>Jean</u>, 23 I. & N. Dec. at 383. The grounds for granting a § 209(c) waiver of inadmissibility are considerably broader in scope than just the probability of torture. In some extraordinary situations, a refugee's removal may result in "exceptional and extremely unusual hardship" even if that refugee will not be tortured.

Both before the BIA and before this Court, Makir-Marwil asserted grounds beyond just torture in an effort to establish "exceptional and extremely unusual hardship" to justify waiving his inadmissibility. Before the BIA, Makir-Marwil argued that he had shown that requisite hardship based on both the likelihood that he would be tortured <u>and</u> "the horrific country conditions in Sudan." Before this Court, Makir-Marwil also argues that he established the requisite hardship based on "the abysmal conditions in Sudan, the fact that he has spent many of his formative years in the United States, and his lack of a support structure or means of surviving in Sudan." Yet the IJ and the BIA denied Makir-Marwil's application for a waiver of inadmissibility based solely on the fact that he would not be removed to Sudan until the possibility of torture had subsided.

By failing to consider any of the other facts and circumstances short of

21

torture in Makir-Marwil's case, the IJ and BIA erred as a matter of law.

Accordingly, we grant Makir-Marwil's petition in part and remand to the BIA with instructions to remand to the IJ to consider in the first instance the argument that the country conditions in Sudan and the other circumstances shown by Makir-Marwil, in the complete record at the time of the hearing in this case, establish "exceptional and extremely unusual hardship" and then whether Makir-Marwil's case warrants a discretionary waiver of his inadmissibility.

**PETITION GRANTED IN PART AND DENIED IN PART; REMANDED FOR FURTHER PROCEEDINGS.**